365 F.2d 770
 Clement S. SMITH, and The Arkansas Teachers Association, Inc., and Margaret J. Sanders, Appellants, and
United States of America, Intervenor-Appellant,
v.
The BOARD OF EDUCATION OF MORRILTON SCHOOL DISTRICT NO. 32, Dr. H. B. White, Felver Rowell, Jack Bland, W. O. Byrd, William Wafford, Wylie Cox, Directors of the Morrilton School District No. 32, and Terry Humble, Superintendent of Schools, Appellees.
 No. 18243.
 United States Court of Appeals Eighth Circuit.
 September 14, 1966.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Michael Meltsner, New York City, for appellants. John W. Walker, Harold Anderson, Little Rock, Ark., and Jack Greenberg and Derrick A. Bell, Jr., New York City, were on the brief.
 James L. Kelley, Atty., Dept. of Justice, Washington, D. C., for United States, intervenor. John Doar, Asst. Atty. Gen., St. John Barrett, and Franklin E. White, Attys., Dept. of Justice, Washington, D. C., and Robert D. Smith, Jr., U. S. Atty., Little Rock, Ark., was with him on the brief.
 Robert V. Light, Little Rock, Ark., for appellees.
 Before VAN OOSTERHOUT, BLACKMUN and GIBSON, Circuit Judges.
 BLACKMUN, Circuit Judge.
 
 
 1
 This appeal presents issues which emerge in the wake of public school desegregation. Specifically, we are confronted with aspects of job protection, if any, afforded negro teachers by the equal protection clause of the Fourteenth Amendment when desegregation results in the closing of an all-negro school. The district court dismissed the complaint on the merits. Thereafter, at the appellate stage, the Attorney General certified the case as one of general public importance; pursuant to the provisions of § 902 of the Civil Rights Act of 1964, 42 U.S.C. § 2000h-2, we granted the United States leave to intervene as an appellant.
 
 
 2
 The suit is one on behalf of negro teachers in Morrilton, Arkansas. It was instituted by Clement S. Smith and The Arkansas Teachers Association, Inc. (with Margaret J. Sanders, by leave of court, as an intervening party plaintiff) against the incorporated Morrilton School Board, the Board's five directors, and Terry Humble, superintendent of the Morrilton public schools. The relief sought is an injunction requiring the employment of high school teachers without regard to race, and the reassignment of elementary teachers and pupils on a basis which disregards race, or, in the alternative, money damages and the presentation and implementation of a plan of reorganization of the school system on a non-racial basis "and the elimination of all other racial factors in school operations". Jurisdiction is established under the old civil rights statutes, 42 U.S.C. §§ 1981 and 1983, and under 28 U.S.C. § 1343(3) and (4) and is not questioned.
 
 
 3
 Plaintiff Smith is a Negro. He taught high school science in Morrilton and was dismissed as hereinafter described. The corporate plaintiff, The Arkansas Teachers Association, Inc., is a non-profit Arkansas corporation with a membership of about 3400 negro teachers in the State. ATA is apparently authorized to engage in litigation for the protection of its members.
 
 
 4
 The defendants coupled their answer with a motion to dismiss as to ATA on the ground that it is neither a real party in interest, Rule 17(a), Fed.R.Civ.P., nor a member of a class on behalf of which relief is sought, Rule 23(a), and to dismiss as to Smith for the same reasons so far as he purports to act on behalf of negro pupils, and, so far as he purports to act for other teachers, on the grounds that the class is not so numerous that joinder of all members is impracticable and that his interest is adverse to all others in the class.
 
 
 5
 The background facts. Until September 1965 teachers and pupils in the Morrilton school system were fully segregated by race. Some demands for desegregation were first made in January of that year. The system serves about 1750 white pupils and about 360 Negroes. There were four elementary schools, one negro and three white, and two junior-senior high schools, one white and one negro. The negro school, covering grades seven through twelve, was known as the L. V. Sullivan High School and had about 166 pupils. The three upper grades of the white school, known as the Morrilton High School, had about 375 pupils; its three lower grades had about the same number.
 
 
 6
 The staff at Sullivan consisted of a principal and seven teachers, including plaintiff Smith and intervenor Sanders.
 
 
 7
 In late February 1965, following a custom of some years, Superintendent Humble by letter advised each Sullivan teacher of his "re-election" to the staff of that school for the 1965-66 school year. The letter stated that this was dependent upon student enrollment at the school; that it was not then possible to be specific about salary; and that a contract would be offered at a later date. It asked the recipient to return a form if he intended to remain with the system "pending your acceptance of financial terms". All Sullivan teachers so indicated a desire to be rehired.
 
 
 8
 Also in February 1965 the school board unanimously adopted and submitted a desegregation plan to the Office of Education of the United States Department of Health, Education and Welfare. Apparently this action was at least partially in response to Title VI of the Civil Rights Act of 1964, 78 Stat. 252, 42 U.S.C. § 2000d et seq., and the HEW regulations thereunder which condition federal financial assistance upon nondiscriminatory activity. The plan as originally submitted noted the anticipated opening of a new high school plant in September. It called for the desegregation of grades seven through twelve by that date, through the freedom-of-choice method, and of grades one through six by September 1966 by the same method. It said nothing about faculty desegregation. The plan was amended in May, however, to follow an HEW-Arkansas form and to include a statement relating to faculty.[1]
 
 
 9
 By way of implementing the freedom-of-choice approach, forms were distributed in May 1965 to all pupils then in grades six through eleven. This included 176 Negroes. Their response was overwhelmingly one way: 81 chose to attend the new integrated senior high school; 79 chose to attend the former all-white school which was now to become the junior high; 12 did not return the form; and only four selected Sullivan The record contains nothing as to the response from white pupils.
 
 
 10
 With these results before them, the school board on May 27, 1965, concluded that it would be uneconomical to operate the Sullivan school in 1965-66 with only four pupils; that Sullivan should be closed; and that the four pupils should be assigned to the then-to-be integrated junior and senior high schools.
 
 
 11
 The following day, May 28, Superintendent Humble went to the Sullivan school. He first conferred with its principal, Hymon King, and told him that he was to be retired because he had reached age 65. Humble then saw the seven teachers together and told them of the decision to close Sullivan and that their jobs were to be abolished. This was confirmed by letter handed to each teacher at the time. This suit was then instituted in June.
 
 
 12
 Mr. Humble testified that as of May 28 no vacancy existed on Morrilton's secondary school staff; that no vacancy for 1965-66 had been filled prior to that date; that he then "didn't know of any vacancies that would occur"; that the staff of the former all-white junior-senior high school would not have to be increased as a result of the absorption of the negro pupils; that he did not advise the Sullivan teachers that they would be eligible to apply for any senior or junior high position which might become available or that they could apply to teach in any of the white elementary schools; that, however, vacancies had occurred during the summers of prior years; that he "had reason to expect it would happen" in 1965; that he told the Sullivan teachers in May he had nothing to offer them; and that he did not suggest to them that vacancies might arise or remind them that they must apply in order to receive consideration.
 
 
 13
 In fact, 13 teachers did resign or retire during the summer of 1965. Nine of these had taught at the white junior-senior high school. Fourteen new teachers were hired; 12 were white and received positions in the senior or junior high schools. Although none of the Sullivan teachers had applied for the accruing vacancies, Mr. Humble, according to his testimony, did consider their qualifications in filling those vacancies but found them inferior to those of the white applicants who were hired.
 
 
 14
 Two of the Sullivan teachers, however, were offered employment in the negro elementary school without the necessity of a formal application. One, Mrs. Zeophus King, wife of the principal, had been the librarian. She orally accepted the new position at first but then asked to be released. The other, Margaret J. Sanders, had taught mathematics. Following her intervention as a plaintiff in the present case she was offered the position Mrs. King had refused. She declined this offer because, she testified, she felt a transfer to the elementary level to be a demotion. At the time of the trial former principal King was teaching as a substitute in the negro elementary school.
 
 
 15
 The district court filed a memorandum in support of its order dismissing the complaint. It observed that the accelerating integration of students poses an economic threat to negro teachers as a class; that this "has always been apparent"; and that the Fourteenth Amendment, however, does not guarantee any racial group a right to public employment or to preferential treatment. The court found that no vacancies existed on the faculties of the remaining schools when Sullivan was closed; that the Sullivan student body could be absorbed into the formerly all-white junior and senior high grades without increasing their faculty; that the Board did not employ extra white teachers in order to avoid offering employment to the Sullivan faculty after Sullivan was closed; that the Board simply applied its traditional policy in cases of the closing of schools due to consolidation, namely, to absorb the teachers of the closed school into the remaining schools if this could be done without displacement of other teachers and, if not, to dismiss the former; that this policy "has been applied uniformly down through the years without regard to race"; and that the Board never had a policy of replacing a teacher because another from a closed school was equally or better qualified. The court then held that the Fourteenth Amendment does not require such a faculty reevaluation; that a contrary holding would give negro teachers a stability of tenure not possessed by white teachers; and that the Constitution does not require that invitations to apply be extended to terminated negro teachers. It stated, in summary and in conclusion,
 
 
 16
 "All that the Court holds here is that if a Negro school is closed at a time when there are no vacancies in the remaining schools, the Constitution does not require the school board to reevaluate the entire faculty, or to replace white teachers with Negroes affected by the closing, or to solicit affirmatively Negro applicants for jobs which subsequently become open."
 
 
 17
 In view of this approach the court found it unnecessary to consider the evidence as to comparative capabilities of various teachers or to determine the representation issues raised by the defendants' motion to dismiss.
 
 
 18
 It is well at this point to note items as to which there is no controversy here:
 
 
 19
 1. No party argues that the February 1965 notifications to the Sullivan teachers of reelection and their favorable responses created any contracts between the board and the teachers. This amounted to an expression of intention on both sides and nothing more. There is, thus, no breach of contract aspect to the case.
 
 
 20
 2. Arkansas has no teachers' civil service or tenure law in any real sense. Teachers are employed in the State on a year-to-year renewal basis. Ark.Stat. Ann. § 80-1304(b) (Supp.1965); Shelton v. Tucker, 364 U.S. 479, 482, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Johnson v. Wert, 225 Ark. 91, 279 S.W.2d 274, 276 (1955).
 
 
 21
 3. The constitutional adequacy of the plan of desegregation (almost obvious on its face, apart from the delay in inception, for it calls for full desegregation in two successive yearly steps, as compared with HEW's three-year maximum) was not passed upon by the district court and is not an issue brought to us for decision by either side. We merely note that full integration, although certainly long delayed in Morrilton, was to be effected in a period of less than two years. And we gave at least some general approval to the freedom-of-choice method in Kemp v. Beasley, 352 F.2d 14, 21 (8 Cir. 1965).
 
 
 22
 4. The record of course does not disclose whether complete integration of the Morrilton school system has been effected by September 1966, as the Board's plan proposed. But we do not assume here that it has not.
 
 
 23
 A. The representation issues. Comment on these issues is indicated and we consider them first. We do so in the light of the now pertinent fact that the United States has the right to intervene in a case of this kind and, indeed, has here presented the necessary certificate and effectuated its intervention. This then entitles it "to the same relief as if it had instituted the action". Section 902 of the Civil Rights Act of 1964, 42 U.S.C. § 2000h-2.
 
 
 24
 The presence of the government in the case as a plaintiff-appellant here lessens the significance and importance of argument as to the standing of ATA. The government and ATA, as a practical matter, occupy the same legal position, namely, the representation and protection of a class of persons claimed to have been deprived of the equal protection of the laws. Nevertheless, we conclude that ATA's standing as a proper party plaintiff is sufficiently established.
 
 
 25
 It has been said that, in order to have standing to litigate a constitutional question, one must be asserting the right in his own behalf. Tileston v. Ullman, 318 U.S. 44, 46, 63 S.Ct. 493, 87 L.Ed. 603 (1943). But this "is only a rule of practice" which may be "outweighed by the need to protect * * * fundamental rights"; that need in turn will prompt courts on grounds of broad constitutional policy to proceed without blind adherence to technical rules of representation. Barrows v. Jackson, 346 U.S. 249, 257, 73 S.Ct. 1031, 1036, 97 L. Ed. 1586 (1953). It is true that the present case does not fit precisely certain of the categories in this area where standing has been recognized. See, for example, NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 458-460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) and Louisiana ex rel. Gremillion v. NAACP, 366 U.S. 293, 296, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961) (where an attempt to assert rights as individuals might result in forfeiting the protection of those rights); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L. Ed.2d 405 (1963) (where an organization litigates the scope of the constitutional protection afforded its members to act collectively); Brewer v. Hoxie School Dist. No. 46, 238 F.2d 91 (8 Cir. 1956) (where courts have devolved upon parties a duty to protect constitutional rights of others and suit is instituted in performance of that duty).
 
 
 26
 There are, however, a number of factors in cases such as the present one which dictate a liberal evaluation of the requirement of standing. One is the possibility, not to be overlooked in the context of contemporary racial controversy, of an element of deterrence, through fear of reprisal, when one makes his own assertion of constitutional rights. Another is the possibility that the individual will lose interest in the litigation if and when he obtains other employment. See Bantam Books, Inc., v. Sullivan, 372 U.S. 58, 64-65, n. 6, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). Another is that integrated pupils possess appropriate concern about racial allocation of faculty. Rogers v. Paul, 382 U.S. 198, 200, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); Bradley v. School Board, 382 U.S. 103, 105, 86 S.Ct. 224, 15 L.Ed. 2d 187 (1965). Still another is the fact that the ATA, and any similar organization functioning in an area where desegregation is in process, faces the distinct possibility that dismissals will adversely affect it as an entity through diminution in membership and financial support. See NAACP v. Alabama ex rel. Patterson, supra, pp. 459-460 of 357 U.S., 78 S.Ct. 1163; Pierce v. Society of Sisters, 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). These factors persuade us that no great significance can be given to the absence of the other Sullivan teachers as parties plaintiff here and that ATA has proper standing as a real party in interest under Rule 17 (a), in the present litigation. We so hold.
 
 
 27
 We are not convinced that this standing is to be defeated, as the defendants argue, because ATA is not itself, technically, an individual member of a class. Certainly a class action, under Rule 23(a), must be brought by a member of the class. Bailey v. Patterson, 369 U.S. 31, 32-33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962). But to argue that ATA here is not a member of the class for which relief is sought is, we think, but another way of arguing the question whether ATA is a real party in interest. 3 Moore's Federal Practice, par. 23.04 at p. 3419 (2d ed. 1964). Having held that ATA is a proper party in this latter respect, we think it follows that it is not to be dismissed from the case because of Rule 23(a). Cases such as Farmers Co-op. Oil Co. v. Socony-Vacuum Oil Co., 133 F.2d 101, 104-105 (8 Cir. 1942), and Alabama Independent Service Station Ass'n v. Shell Petroleum Corp., 28 F.Supp. 386, 390 (N.D.Ala. 1939), cited by the defendants, do not appear to us to be controlling in this area.
 
 
 28
 We note, incidentally, that ATA's standing in Shelton v. Tucker, supra, seems not to have been challenged. See 364 U.S. at p. 482, 81 S.Ct. 247, 5 L.Ed. 2d 231, and the same case below, Shelton v. McKinley, 174 F.Supp. 351, 353, n. 1 (E.D.Ark.1959). Similarly, no such challenge to a teachers association appears to have been made in Franklin v. County School Bd., 360 F.2d 325 (4 Cir. 1966), and Chambers v. Hendersonville City Bd. of Educ., 245 F.Supp. 759 (W.D. N.C.1965). See Bates v. City of Little Rock, 361 U.S. 516, 523, n. 9, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). Also, Alston v. School Board, 112 F.2d 992, 997 (4 Cir.1940), cert, denied 311 U.S. 693, 61 S.Ct. 75, 85 L.Ed. 448, and Buford v. Morganton City Bd. of Educ., 244 F. Supp. 437, 445 (W.D.N.C. 1965), are flat holdings that a teachers association is a proper, although not a necessary, party in litigation of this kind.
 
 
 29
 This makes any determination of the issue of the individual plaintiffs' standing as appropriate representatives of a class of little consequence. Certainly they are proper parties here on their own behalf. We are content to limit our recognition of their status at that point and we do so primarily because we are not convinced that, upon the circumstances disclosed by this record, the class — of only seven dismissed negro teachers, including these two — is one "so numerous as to make it impracticable to bring them all before the court", within the language of Rule 23 (a) as it read prior to its revision effective July 1, 1966. Thaxton v. Vaughan, 321 F.2d 474, 478 (4 Cir. 1963); Matthies v. Seymour Mfg. Co., 270 F. 2d 365, 368 (2 Cir. 1959), cert. denied 361 U.S. 962, 80 S.Ct. 591, 4 L.Ed.2d 544; Giordano v. Radio Corp. of America, 183 F.2d 558, 561 (3 Cir. 1950); Association for Preservation of Freedom of Choice v. Wadmond, 215 F.Supp. 648, 651 (S.D.N.Y.1963); 3 Moore's Federal Practice, par. 23.05 (2d ed. 1964); 2 Barron and Holtzoff Federal Practice and Procedure § 562.4 (Rules Ed.1961). Compare Citizens Banking Co. v. Monticello State Bank, 143 F.2d 261, 264 (8 Cir. 1944).
 
 
 30
 B. The constitutional issues. A dozen years ago the Supreme Court held that racial discrimination in a state's system of public education violates the equal protection clause of the Fourteenth Amendment. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The Court forthwith considered the procedure by which this decision was to be implemented. Brown v. Board of Education, 349 U.S. 294, 75 S. Ct. 753, 99 L.Ed. 1083 (1955). It recognized as its objective the orderly "transition to a system of public education freed of racial discrimination" and noted that this "may require solution of varied local school problems" and the "elimination of a variety of obstacles". Among the problems which the Court foresaw were those related to school personnel. Pp. 299-300 of 349 U.S., at pp. 755-756 of 75 S.Ct.
 
 
 31
 It is our firm conclusion that the reach of the Brown decisions, although they specifically concerned only pupil discrimination, clearly extends to the proscription of the employment and assignment of public school teachers on a racial basis. Cf. United Public Workers v. Mitchell, 330 U.S. 75, 100, 67 S.Ct. 556, 91 L.Ed. 754 (1947); Wieman v. Updegraff, 344 U.S. 183, 191-192, 73 S.Ct. 215, 97 L.Ed. 216 (1952). See Colorado Anti-Discrimination Comm'n v. Continental Air Lines, Inc., 372 U.S. 714, 721, 83 S.Ct. 1022, 10 L.Ed.2d 84 (1963). This is particularly evident from the Supreme Court's positive indications that nondiscriminatory allocation of faculty is indispensable to the validity of a desegregation plan. Bradley v. School Board, supra; Rogers v. Paul, supra. This court has already said, "Such discrimination [failure to integrate the teaching staff] is proscribed by Brown and also the Civil Rights Act of 1964 and the regulations promulgated thereunder". Kemp v. Beasley, supra, p. 22 of 352 F.2d.
 
 
 32
 This brings us to the two aspects of the Morrilton situation, namely, the dismissal of the entire Sullivan faculty and the manner of filling the system's teaching vacancies as they occurred in the summer of 1965.
 
 
 33
 1. The faculty dismissal. We recognize the force of the Board's position that the discharge of the Sullivan staff upon the school's closing was only consistent with the action taken by the Board in connection with eleven other school consolidations, and consequent closings, in the past. This stands in contrast to the past practice noted in Franklin v. County School Bd., supra, p. 326 of 360 F.2d. And we need not now determine whether across-the-board staff dismissals in the absence of vacancies when a school is closed, and the failure comparatively to evaluate the qualifications of those dismissed with the qualifications of those retained, standing alone and apart from racial considerations, amount to an unconstitutional selection method. Faculty team consciousness, faculty and student morale, and the sense of job security attendant upon an absence of ever-recurring system-wide reevaluation whenever a consolidation occurs, might conceivably qualify as acceptable and valid factors in a school board's employment policy.[2]
 
 
 34
 But on this record these dismissals do not stand alone. This Board maintained a segregated school system for more than a decade after its unconstitutionality was known and before it implemented a plan to desegregate. The employment and assignment of teachers during this period were based on race. Negro teachers were hired and assigned to teach only in all-negro schools; white teachers were hired and assigned to teach only in all-white schools. The use of the freedom-of-choice plan, associated with the fact of a new high school plant, produced a result which the superintendent must have anticipated, despite his testimony that he "rather guessed" that Sullivan would continue to operate; he had also observed from the witness stand, in listing reasons for the Board's decision to begin desegregation with the upper grades, that "the Sullivan High School was not a type plant that the Board or I would like our children to attend school in", and that the Sullivan staff "didn't approach the level of the white slate". All this reveals that the Sullivan teachers did indeed owe their dismissals in a very real sense to improper racial considerations. The dismissals were a foreseeable consequence of the Board's somewhat belated effort to bring the school system into conformity with constitutional principles as enunciated by the Supreme Court of the United States.
 
 
 35
 There is another factor, too, which may have at least some significance. In the 1965 system change the former all-white junior-senior high school was to become an integrated junior high school. Its former all-white high school portion, therefore, was being "closed" in much the same sense as was Sullivan's. Thus, it may be appropriately suggested that, even under the Board's stated policy, incumbent white teachers for the senior high grades should enjoy no greater security of employment than the Sullivan teachers for the senior high grades.
 
 
 36
 The Board's stated consolidation policy must give way if the result of its use is a deprivation of constitutional rights. Cf. Cooper v. Aaron, 358 U.S. 1, 16, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). In Dove v. Parham, 282 F.2d 256, 258 (8 Cir. 1960), we said:
 
 
 37
 "Standards of placement cannot be devised or given application to preserve an existing system of imposed segregation. Nor can educational principles and theories serve to justify such a result. These elements, like everything else, are subordinate to and may not prevent the vindication of constitutional rights."
 
 
 38
 See Norwood v. Tucker, 287 F.2d 798, 809 (8 Cir. 1961). While the Supreme Court has recognized that race in certain contexts may have proper and valid significance, Tancil v. Woolls, 379 U.S. 19, 85 S.Ct. 157, 13 L.Ed.2d 91 (1964), affirming per curiam Hamm v. Virginia State Bd. of Elections, 230 F.Supp. 156, 158 (E.D.Va.1964); McLaughlin v. State of Florida, 379 U.S. 184, 192, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964), we feel that the Board's consolidation policy may not be applied where, as here, a school is closed as the direct consequence of an effort to rectify constitutional defects in the method by which pupils and teachers have previously been assigned, where the effect is to impose, without some concern for qualifications to teach, the heavy burden of unemployment solely upon those whose constitutional rights were violated, and where an additional result may be to impede meaningful realization of the constitutional rights of others, that is, the pupils. Rogers v. Paul, supra, p. 200 of 382 U.S., 86 S.Ct. 358, 15 L.Ed.2d 265. Under circumstances such as these, the application of the policy (although that policy is non-discriminatory on its face and is based upon otherwise rational considerations) becomes impermissible. Cf. Louisiana v. United States, 380 U.S. 145, 154-55, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965) (voting registration requirement "frozen" in order to obviate effect of prior discriminatory application); Ross v. Dyer, 312 F.2d 191 (5 Cir. 1962) ("brother-sister" rule not to be superimposed on "stair-step" desegregation); United States v. Palmer, 356 F.2d 951 (5 Cir. 1966) (voting registration office not to be closed where disproportionate number of Negroes remain unregistered as result of past discriminatory practice); United States v. Logue, 344 F.2d 290 (5 Cir. 1965) (supporting witness or voucher requirement not to be applied to negro voting registrants where no Negroes have been registered); Meredith v. Fair, 298 F.2d 696 (5 Cir. 1962) (negro college applicant not to be required to submit certificate of alumni support where lack of negro alumni and opportunity for contact with white alumni render this requirement particularly burdensome); Franklin v. Parker, 223 F.Supp. 724 (M.D.Ala.1963), aff'd per curiam as modified, 331 F.2d 841 (5 Cir. 1964) (graduate school not to deny admission to Negro because of his failure to graduate from accredited college where the state operated no accredited college to which Negroes were admitted).
 
 
 39
 We note that this result finds positive support in the "Revised Statement of Policies for School Desegregation Plans under Title VI of the Civil Rights Act of 1964", 45 C.F.R., Part 181, § 181.13, promulgated by HEW in March 1966 and issued pursuant to the authority of § 602 of the Act, 42 U.S.C. § 2000d-1. We have said heretofore that the HEW guidelines, although not binding on the courts, are entitled to serious judicial deference. Kemp v. Beasley, supra, pp. 18-19 of 352 F.2d. See, also, Singleton v. Jackson Municipal Separate School Dist., 348 F.2d 729, 731 (5 Cir. 1965); Price v. Denison Independent School Dist. Bd. of Educ., 348 F.2d 1010, 1012-1014 (5 Cir. 1965); Singleton v. Jackson Municipal Separate School Dist., 355 F.2d 865, 869 (5 Cir. 1966).
 
 
 40
 We therefore hold that the Sullivan dismissals, although pursuant to a tradition and policy not invalid on their face, assumed questionable status in the light of the Board's unconstitutional practices in the past which contributed to teacher status in the present. We thus disagree with the district court's conclusion that because the Board's action here only conformed with what had been done in prior school consolidations its present action is immune from constitutional attack.
 
 
 41
 2. The filling of vacancies. But even if our analysis as to the Sullivan dismissals should be in error, and those dismissals are, instead, constitutionally unassailable, the Board's method of filling the 1965 vacancies falls short, we think, of applicable constitutional standards.
 
 
 42
 It is not necessary that we decide whether the superintendent's failure formally to advise the Sullivan teachers that they must apply for any such vacancy and his failure to solicit their applications possessed significance. This is so because he asserts that in filling the summer vacancies he did consider the qualifications of the dismissed teachers anyway and concluded that they were inferior to those of other applicants. The situation, thus, is the same as though the dismissed teachers had applied.
 
 
 43
 We note initially that there are a number of factors which bear adversely upon the defense position here: The Board was willing to recruit and hire Miss Sanders and Mrs. King for the negro elementary school. Miss Sanders was employed after the present litigation was begun even though she made no formal application and, although qualified, possessed no elementary certificate. None of the prior school consolidations and closings was occasioned because of integration. After those consolidations many of the teachers from the closed schools were eventually placed and new applications were not then required of them. Mr. King was employed in a negro elementary school even though told he was being retired because of age. While Mr. Humble could not "recall" it, plaintiffs Smith and Sanders testified that the superintendent had stated that negro teachers did not fit into the developing pattern and that white pupils could not adjust to them in the classroom. Mr. Humble conceded that state and local newspapers had carried an account of his making a statement to that effect. Although the dismissed teachers had been employees for some time they were not advised to apply for vacancies or of the presence of vacancies as they did occur.
 
 
 44
 According to Mr. Humble's testimony, initial consideration is given to an applicant's "paper qualifications", that is, academic degrees, major fields, graduate credits, and teaching experience. The reputation of the institutions attended is kept in mind. Other factors are temperament and morals. Sometimes the district's needs dictate that an applicant be qualified to teach more than one subject or, in addition to teaching, to supervise extracurricular activities. On direct examination, the superintendent discussed considerations relevant specifically to the employment of a teacher to instruct pupils of another race. One of the major factors, he said, was environment; negro teachers do not understand many of the problems of white pupils; this relates to the ability of a teacher to communicate or to establish rapport with a pupil; graduates of certain Arkansas negro colleges, "generally speaking", are inferior to graduates of other Arkansas colleges whose student bodies are white; these communication problems are rooted in differing "speech patterns". Within the framework of these "practical situations" the superintendent stated he fully intended to hire teachers without regard to race.
 
 
 45
 In their brief the defendants deny that any Sullivan teacher was passed over in filling vacancies on racial grounds. They do argue, however, that race may be a rational and permissible criterion in the employment of teachers in various senses and for various reasons. They suggest that a Negro may be disqualified for a reason generally associated with race but which is not grounded on consideration of race per se. For example, an applicant may be considered inferior because he attended a poorly regarded negro college, or because his speech pattern is so different from that of his prospective pupils as to pose a serious obstacle to communication, or because he fails to pass an objective qualification test. It is argued that in some circumstances race per se may be a valid factor. Thus, rapport between teacher and pupil, which is essential "to a really effectual instructional effort", may be unattainable where they are of different races and this difference affects attitudes, personal philosophies and prejudices. It is also said that a teacher may bear such hostility toward members of another race as to render him incapable of effectively educating them.
 
 
 46
 We recognize that teaching is an art and that excellence does not depend upon knowledge, experience, formal training and classroom conduct alone. Fitness for teaching rests upon a broad range of factors and encompasses numerous personality and character traits. See Shelton v. Tucker, supra, p. 485 of 364 U.S., 81 S.Ct. 247, 5 L.Ed.2d 231; Beilan v. Board of Pub. Educ., 357 U.S. 399, 405, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958); Adler v. Board of Educ., 342 U.S. 485, 493, 72 S.Ct. 380, 96 L.Ed. 517 (1952); Morris v. Williams, 149 F.2d 703, 708 (8 Cir. 1945); Brooks v. School Dist., supra, pp. 736-737 of 267 F.2d; Safferstone v. Tucker, 235 Ark. 70, 357 S.W.2d 3, 4 (1962). In addition, the particular needs of a school district may at times genuinely require that weight indeed be given to an applicant's ability to teach more than one subject, or, in addition to teaching, to supervise extracurricular activity. Nothing contained in this opinion is intended to be restrictive of a school board's freedom to make full inquiry and to give due consideration to an applicant's qualifications and the district's needs in filling vacancies so long as the board does not act unreasonably, arbitrarily, capriciously, or unlawfully. Brooks v. School Dist., supra, p. 739 of 267 F.2d. However, in this day race per se is an impermissible criterion for judging either an applicant's qualifications or the district's needs. And this applies equally to considerations described as environment or ability to communicate or speech patterns or capacity to establish rapport with pupils when these descriptions amount only to euphemistic references to actual or assumed racial distinctions. Obviously underlying the Brown decisions is the principle that such distinctions, if and to the extent they exist, do not justify segregation in educational institutions. Desegregation of pupils inevitably means that some of them will be exposed to teachers of another race. It is now too late for a school board to assume that it may objectively regard all supposed racial differences in order to avoid its obligation to employ teachers in accord with constitutional standards. Stell v. Savannah-Chatham County Bd. of Educ., 318 F.2d 425, 427 (5 Cir. 1963), 333 F.2d 55, 61 (5 Cir. 1964), cert. denied 379 U.S. 933, 85 S.Ct. 332, 13 L.Ed.2d 344; Brown v. School Dist. No. 20, 226 F.Supp. 819, 825-826 (E.D.S.C.1963), aff'd per curiam, 328 F.2d 618 (4 Cir. 1964), cert. denied 379 U.S. 825, 85 S.Ct. 52, 13 L. Ed.2d 35; Armstrong v. Board of Educ., 333 F.2d 47, 50 (5 Cir. 1964); Jackson Municipal Separate School Dist. v. Evers, 357 F.2d 653, 654 (5 Cir. 1966), cert. denied 384 U.S. 961, 86 S.Ct. 1586.
 
 
 47
 As is manifest from the foregoing summary of Mr. Humble's testimony and our critique of the criteria he and the Board used in filling the summer vacancies, we are of the opinion that their practices in this respect are not constitutionally sustainable. Since some of the standards applied were improper, we do not attempt to determine now whether any or all of the teacher selections could have been justified on legitimate grounds. Some might well have been. For example, Gloria Jean King was chosen over Sullivan teacher Geneva Braswell for a position as a speech-English teacher. While Mrs. Braswell had 14 years' teaching experience and 22 graduate credits, and Miss King had experience only as a practice teacher and no graduate training, there was substantial evidence that Mrs. Braswell was not qualified to teach speech and dramatics or to direct plays. Similarly, Richard Reed and Paul Cody were selected, respectively, to teach physics and mathematics, and to teach mathematics, drive a school bus, and coach junior high football and basketball, although neither had graduate training, Reed had only two and a half years' teaching experience and Cody had no teaching experience. Miss Sanders, the Sullivan mathematics teacher, did have 27 graduate credits and 34 years' teaching experience but she was not qualified to teach physics or to coach football and basketball.
 
 
 48
 The record reveals situations in which the decision to pass over a Sullivan teacher is not so persuasively justified and in which improper criteria may well have played a decisive part. For example, the record contains no satisfactory explanation for the employment of Katherine Draper rather than Mrs. Braswell to teach junior high English. Miss Draper had majored in physical education and had neither graduate training nor teaching experience. A similar instance is present in the employment of Robertha Jo Lackey to teach history in the senior high school. She was a beginning teacher. The superintendent conceded that her qualifications were not superior to those of Phillip Jones, a Sullivan social studies teacher. Mr. Humble testified that, in his view, Miss Lackey would be a better teacher because of her superior ability to understand some of the problems of the white students. There are other examples of this kind.
 
 
 49
 We therefore conclude that this record as it comes to us discloses an unconstitutional selection process. See Franklin v. County School Bd., 360 F.2d 325 (4 Cir. 1966); Christmas v. Board of Educ., 231 F.Supp. 331, 336-337 (D.Md. 1964).
 
 
 50
 We recognize that it has been said that the burden of proof as to discrimination in a situation of this kind is on the one who asserts it and is not upon the school board. Chambers v. Hendersonville City Bd. of Educ., supra, p. 765 of 245 F.Supp. We feel, however, that the plaintiffs here have sustained any such burden which they possess.
 
 
 51
 C. The remedy. The formulation of relief appropriate to this case is rendered difficult by its nature and by the passage of time since the relevant events transpired. It is a matter of balancing equities. See 42 U.S.C. § 1983; Smith v. Hampton Training School, 360 F.2d 577, 581 (4 Cir. 1966). We bear in mind: (1) All the dismissed Sullivan teachers had been recognized in February 1965 by the superintendent, at least upon principal King's recommendation, as being then qualified to teach in their respective assignments. (2) The superintendent in turn recommended their employment for 1965-66. The Board went along and the letters of intent were issued. (3) The teachers thus continued to possess at least the minimum qualifications for teaching in the Morrilton schools. Cf. Franklin v. County School Bd., supra, p. 327, n. 3, of 360 F.2d, where the court indicated that the relief it was granting was not to apply to a teacher where it could be objectively demonstrated that that teacher would not have been reemployed under any circumstances. (4) Except for plaintiff Smith, the record is not fully informative as to the employment status of the Sullivan teachers at the time of the trial. Smith did testify that he found employment in Chicago at a salary more than double what he had received at Sullivan. There is evidence that Miss Sanders obtained work as a teacher in another Arkansas high school, that Phillip Jones found work as a personnel counselor at an Arkansas college, that Hymon King was substitute teaching, and that Helen Oliver had refused employment. There is little or nothing concerning the other three. (5) The record is unclear as to whether principal King's retirement came about because of an established rule of general application or merely because of a discretionary decision of the Board. The timing and perhaps the district's contract form suggest the latter; if so, King is entitled to the same relief as the Sullivan teachers. (6) It is not absolutely clear that all or any of the Sullivan staff would have been entitled to reemployment by the Board if a faculty-wide evaluation had been undertaken and nondiscriminatory standards had been applied in filling the summer vacancies. (7) New teachers were hired by the Board during the summer of 1965 and, presumably have now been hired for the 1966-67 school year.
 
 
 52
 In view of the passage of time, the intervening employment of new teachers, the pendency of the new term, the necessity of already having made plans for the current year, and the paucity of evidence as to the employment status of those dismissed, we feel that it would not be appropriate now to require a comparative evaluation of the Morrilton faculty as of May 1965, or as of the beginning of the 1965-66 school year, or as of the present. Like reasons persuade us that it would not be appropriate to order reinstatement of the dismissed teachers irrespective of the current needs of the district.
 
 
 53
 We do feel, however, that since the dismissed teachers have been denied the comparative evaluation which was due them and nondiscriminatory consideration for vacancies filled since their dismissals, they, except for plaintiff Smith, are now entitled, if they so desire, to some preference in the filling of vacancies in the secondary school faculties which exist at the time of this decision or which arise in the future. Cf. Franklin v. County School Bd., supra. This is to be accomplished along the following lines: (1) The Board shall forthwith ascertain, with respect to each member of the former Sullivan faculty, other than Smith, whether that member remains interested in employment with the Morrilton district and, if so, the subjects which he is qualified to teach as measured by standards currently and legally applied by the Board. (2) A teacher who manifests such interest shall then be offered the first position for which he is so qualified in which a vacancy now exists or hereafter occurs. (3) This preference, however, shall extend only to the first such vacancy so offered to that teacher; irrespective of his acceptance or refusal of the first offered, he shall not be entitled to preference with respect to any subsequent vacancy.
 
 
 54
 On remand, the trial court in its discretion may grant injunctive relief if it deems this is necessary to insure that the defendants do not further practice discrimination in the employment and assignment of school personnel.
 
 
 55
 The court also will be confronted with the question of damages. Each of the former Sullivan teachers except Smith shall be entitled and shall be afforded the opportunity to establish, if he can, that he was damaged by his dismissal and the amount of such damage. The period for which damage may be shown is the period between the completion of the teacher's service at Sullivan and the filing date of this opinion, except that with respect to any teacher who, pursuant hereto, manifests a desire to obtain reemployment in the Morrilton schools, the period will also include the time between the date of this opinion and the effective date of reemployment offered him. Of course, the normal rules of mitigation shall apply to these damage determinations.
 
 
 56
 We except plaintiff Smith from the relief to be offered because he testified directly that he did not want his Morrilton work back and would not accept a job there teaching the same courses, and that his Chicago work was the "best thing that ever happened to [him] employmentwise". He thus has made his considered choice and waived any possible claim to relief to which he might otherwise be entitled.
 
 
 57
 We recognize, as the Board has pointed out, that the subchapter on Equal Employment Opportunities of the Civil Rights Act of 1964 excludes from the term "employer" a state or political subdivision thereof, 42 U.S.C. § 2000e(b), and is made inapplicable to an educational institution's educational activities, 42 U.S.C. § 2000e-1. But we deal here with constitutional rights and not with those established by statute.
 
 
 58
 We sympathize with this school board in its attempt to deal fairly and now expeditiously with the burgeoning problems attendant upon desegregation and the disclocation of a system which for so many years received constitutional approbation. But the old standards are long since changed, those currently in effect must be followed by this court, the district court and the school board, and administrative problems may not be used as a barrier to the realization of constitutional rights. Kemp v. Beasley, supra, p. 20 of 352 F.2d.
 
 
 59
 We are grateful for the able oral argument and briefs submitted by counsel on both sides.
 
 
 60
 The judgment of the district court is vacated and the case is remanded for further proceedings consistent with the views herein expressed.
 
 
 
 Notes:
 
 
 [1]
 "Beginning with the 1965-66 school year, the Board of Directors will undertake and complete as expeditiously as possible the desegregation of the teachers and professional staff, with the end in view of recruitment and assignments without regard to race. During the 1965-66 school year, faculty meetings, teachers' meetings, principals' meetings and in-service workshops will be desegregated and conducted on a non-racial basis."
 
 
 [2]
 The United States in its brief here concedes this, although the amicus brief does not. We note that in some situations which have reached the courts the school board did undertake a comparative evaluation of qualifications before dismissing negro teachers upon the closing of a school. The court was called upon to determine only whether this was done in good faith and whether the dismissals were based on factors other than race. Our own case of Brooks v. School Dist., 267 F.2d 733, 736 (8 Cir. 1959), cert. denied 361 U.S. 894, 80 S.Ct. 196, 4 L.Ed.2d 151, is an example. Others are Buford v. Morganton City Bd. of Educ., 244 F.Supp. 437 (W.D.N.C.1965) and Chambers v. Hendersonville City Bd. of Educ., 245 F.Supp. 759 (W.D.N.C.1965). See Franklin v. County School Bd., 242 F.Supp. 371, 374 (W.D.Va.1965), rev'd on other grounds, 360 F.2d 325 (4 Cir. 1966), and Bell v. School Bd., 249 F. Supp. 249, 252 (W.D.Va.1966)