## UNITED FEDERATION OF POSTAL CLERKS, AFL–CIO, et al., Appellants,

### v.

### W. Marvin WATSON, Postmaster General of the United States, Appellee.

### No. 21685.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 2, 1968.

Decided Feb. 27, 1969.

---

Mr. Herbert S. Thatcher, Washington, D. C., with whom Mr. Donald M. Murtha, Washington, D. C., was on the brief, for appellants.

Mr. Ralph A. Fine, Attorney, Department of Justice, with whom Asst. Atty. Gen. Edwin L. Weisl, Jr., Messrs. David G. Bress, U. S. Atty. and Alan S. Rosenthal, Attorney, Department of Justice, were on the brief, for appellee. Mr. Frank Q. Nebeker, Asst. U. S. Atty., also entered an appearance for appellee.

Before BAZELON, Chief Judge, and WRIGHT and LEVENTHAL, Circuit Judges.

BAZELON, Chief Judge:

In this action for declaratory judgment and injunctive relief, appellants challenge the Postmaster General's construction of Sections 3571 and 3573 of the Federal Employees Salary Comparability Act of 1965.[1] These sections purportedly modernized the working conditions of postal employees by providing overtime pay for

1. 39 U.S.C. §§ 3571–3575 (Supp. III, 1968).

overtime work in place of the anachronistic system of compensatory time off, but appellants say the Post Office has found an ingenious (but illegal) way to avoid the prescribed modernization. The District Court granted summary judgment against appellant Groettum and dismissed the complaint as to the appellant Federation for want of standing.

Under the Salary Act, set out in pertinent part in the margin,[2] the Postmaster General is required to "establish work schedules in advance for annual rate regular employees consisting of five eight-hour days in each week." Any annual rate regular who is required to work "in excess of his regular work schedule" must be paid overtime for such work. The Postmaster General has authority "to determine the * * * week used in computing overtime work."

Pursuant to this statutory scheme, the Postmaster General established a "service week" extending from Saturday to Friday. Appellant Groettum, a senior annual rate regular employee, was assigned a work schedule calling for a Monday-to-Friday workweek.[3] Thus, five

---

2. § 3571. *Maximum hours of work*

(a) A basic workweek is established for all postal field service employees consisting of five eight-hour days * * *.

(b) The Postmaster General shall establish work schedules in advance for annual rate regular employees consisting of five eight-hour days in each week.

    *      *      *      *      *

(d) To the maximum extent practicable, senior regular employees shall be assigned to a basic workweek Monday through Friday, inclusive, except for those who express a preference for another basic workweek.

§ 3573. *Compensatory time, overtime, and holidays*

(a) In emergencies or if the needs of the service require, the Postmaster General may require employees to perform overtime work or to work on holidays. Overtime work is any work officially ordered or approved which is performed by—

(1) an annual rate regular employee in excess of his regular work schedule,

(2) an hourly rate regular employee in excess of eight hours in a day or forty hours in a week, and

(3) a substitute employee in excess of forty hours in a week.

The Postmaster General shall determine the day and week used in computing overtime work.

3. Latter-day Scholastics may enjoy defining and distinguishing the statutory terms "basic workweek" and "work schedule." First compare § 3571(a) with § 3571(b), *supra* note 2, to discover that the "basic workweek" established for all postal employees consists of five eight-hour days, whereas the work schedules of annual rate regular employees are to consist of five eight-hour days in each week. Before finally concluding that a work schedule specifies the particular five days an employee is to work, consider § 3571(d), which gives senior regular employees preference for a "basic workweek" of Monday through Friday.

Now add the definitions attempted in an agreement between the Post Office and the appellant Federation: "A basic workweek is five eight-hour days," including "fixed," "rotating," "periodic," or "flexible" "work cycles"; a "work schedule," on the other hand, is "a regularly scheduled tour of specific hours for each scheduled [by the work schedule or by the basic workweek?] service day within an established basic workweek."

The original House bill, H.R. 10281, 89th Cong., 1st Sess., 1965, amended Section 3571 to read in part:

A basic workweek is established for all postal field service employees, consisting of five eight-hour days excluding Saturday and Sunday. To provide service on days other than those included in the basic workweek, the Postmaster General shall establish work schedules in advance for annual rate regular employees consisting of five eight-hour days in each week. To the maximum extent possible, senior annual rate regular employees shall be assigned to the basic workweek. * * *

H.R.Rep. No. 792, 89th Cong., 1st Sess. 40 (1965). This version was ultimately rejected, however, because it was thought unduly to restrict the Postmaster General's discretion to schedule weekend work. (As written, the section could have been construed as excluding altogether scheduling hourly rate and substitute employees outside the Monday-to-Friday workweek.) This earlier provision does, however, provide insight into what was once meant by a "basic workweek"—namely, the days ordinarily to be worked by all employees except those annual rate regular employees who were assigned different work

days did appellant labor, and on the first and second day (of the service week) he rested. On Thursday, June 16, 1966, however, appellant was informed that because of a temporary shortage of personnel, his schedule for the next week was to be changed, so that he would work Saturday and Sunday and rest Monday and Friday. He did as he was told, but received no overtime pay for working on his regularly scheduled off days. At the end of the aberrant week he resumed his customary routine. He now contends that he should have been paid overtime for this weekend work "in excess of his regular work schedule."

Undaunted by this contention, appellee has in fact made such temporary changes in work schedules (without payment of overtime) an announced departmental policy.[4] As a result, the appellant Federation has other complaining members, present and prospective, besides Groettum, and seeks equitable relief against this established practice.

## I

█ Appellee appears to regard as the central issue his right to make temporary changes in established work schedules to meet emergencies and transitory needs of the service.[5] He notes that nothing in the Act expressly prohibits such temporary changes, so long as they are made "in advance" and so long as they do not require more than five days' work in any service week (or more than eight hours in any day). And he points to legislative history which indicates Congressional concern to avoid interfering with his authority to schedule weekend work where necessary.[6]

█ We agree that under the Act appellee may temporarily alter work schedules upon proper notice given "in advance." Not only is there no express bar against such changes, but the Act repeatedly refers to "regular work schedules," [7] thus plainly implying the possibility of temporary alterations. The question, however, is whether the employees whose schedules have been disrupted are entitled to premium pay for any regularly scheduled off days they are required to work. The statute calls for overtime compensation for any work "in excess of [the] * * * *regular* work schedule." [8] If we are to give any force to the word regular in this provision, we cannot accept appellee's contention that Congress intended to pay overtime only for work in excess of eight hours in

schedules in advance. What the establishment of a "basic workweek" *now* means is anybody's guess.

Fortunately, we are not required to construe the term "basic workweek" in this case. We understand the term "work schedule" to refer to the scheduled days and hours to be worked by annual rate regular employees in a service week. By the non-statutory term "workweek," we mean simply the work days designated in the work schedule.

4. Postal Bulletin 20553, September 22, 1966, announces:

Temporary changes in hours and days of work shall not be made unless service needs at an installation preclude adherence to regular work schedules; such temporary changes shall be held to a minimum. Employees shall be given as much advance notice as possible of temporary work schedules, but in no case shall they be notified later than the end of their tours of duty the preceding Wednesday. If notified after Wednesday, employees required to work outside their regular schedules shall be compensated at the overtime rate if permitted by law. * * *

5. Appellee's contention that this is an unconsented suit against the Government is far wide of the mark. At its hoariest, the doctrine of sovereign immunity has not barred adjudication of a suit claiming that a Government officer is acting outside his statutory authority and thereby depriving the plaintiff of statutory rights. United States v. Gates, 148 U.S. 134, 13 S.Ct. 570 (1893); Dugan v. Rank, 372 U.S. 609, 621, 83 S.Ct. 999, 101 L.Ed.2d 15 (1963).

6. See note 3, *supra*; note 19, *infra*.

7. 39 U.S.C. § 3573(a) (1), *supra* note 2; 39 U.S.C. § 3573(e); 39 U.S.C. § 3573 (h) (1), (2), (3).

8. 39 U.S.C. § 3573(a) (1), *supra* note 2 (emphasis added).

one day or five days in any service week. All work schedules for annual rate regular employees under the Act consist of five eight-hour days,[9] and if Congress meant to limit overtime to work quantitatively in excess of the statutorily defined "work schedule," the word "regular" was mere surplusage. Moreover, for all *other* postal employees, the Act defines overtime quantitatively in terms of the number of hours and days worked.[10] That it chose a different formulation in terms of "work schedule" for annual rate regulars strongly suggests that it had an additional nonquantitative consideration in mind—namely, *which* days and hours in particular the employee was compelled to work.[11]

Admittedly, Congress could have expressed this intent at a saving of untold confusion if it had simply called overtime any work "outside of" the regular work schedule. In addition, there is some language in the legislative history to support the view that overtime under the Act is only work "on a sixth or seventh day" or for "more than eight hours a day." [12] In many respects besides this one, the statute will not be remembered as a classic of lucid drafting. But the major thrust of the legislative history and the tenor of the statute as a whole support the construction advanced by appellants.

In endorsing the Act then pending before the Senate Post Office and Civil Service Committee, Postmaster General Gronouski expressed his "amazement" at the "antiquated, unsatisfactory" overtime practices then in effect in the Post Office Department.[13] One of these practices was that

9. 39 U.S.C. § 3571(b), *supra* note 2.

10. 39 U.S.C. § 3573(a) (2) and (3), *supra* note 2.

11. For amplification and confusion concerning the term "work schedule," *see* note 3, *supra*.

12. In support of the proposed legislation ultimately enacted as the Salary Act, Postmaster General Gronouski told the Senate Post Office and Civil Service Committee that

[r]egular employees should have a work schedule of 40 hours a week, consisting of five 8-hour days. For work in excess of that schedule—more than 8 hours in one day, or duty on a sixth or seventh day—premium pay will be required.

Hearings on H.R. 10281 Before the Senate Committee on Post Office and Civil Service, 89th Cong., 1st Sess. 42–48 (1965) [hereinafter cited as "*Hearings*"]. On the other hand, in the same testimony, Mr. Gronouski went on to say that

any work *on a scheduled day off* would be paid at the rate of time and a half in cash rather than in compensatory time off.

*Id.* (emphasis added).

The Senate Committee itself said only that

regular employees * * * will be paid for any overtime work (regular employees have an advance-scheduled basic workweek of five eight-hour days)

S.Rep. No. 910, 89th Cong., 1st Sess. 5 (1965), U.S.Code Cong. & Admin.News 1965, p. 3821. Inferences to be drawn from its use of the language "advance-scheduled basic workweek" are left to the imagination. The statute seems to say that while *all* employees have a "basic workweek," § 3571(a), *supra* note 2, only *annual rate* regular employees are entitled to "work schedules" established "in advance." § 3571(b), *supra* note 2. Moreover, as noted in the text, the statute provides different overtime formulae for annual rate regulars than for hourly rate regulars. But in a tabular summary of the effect of its legislation, the Senate Committee again lumps together all regular employees by describing overtime for "regulars" as "over 8 hours a day or 40 hours a week." S.Rep. No. 910, *supra*, at 12 (Appendix A–1).

The House Report does take note of the apparently unique standard of overtime set for annual rate regulars. It says, correctly, that overtime for an hourly rate regular employee is work performed "in excess of 8 hours a day or 40 hours a week." In contrast, overtime for an annual rate regular is any work performed "in excess of his basic workweek schedule." H.R.Rep. No. 792, *supra* note 3, at 8. This formulation adds the concept of a "basic workweek schedule" to the ranks of the "basic workweek" and the "work schedule," but contributes little else to general understanding.

In sum, the bits of legislative history explaining the meaning of the overtime provision are not very enlightening.

13. Hearings, *supra* note 12.

our regulars, ostensibly assigned Monday-through-Friday schedules, were getting only compensatory time for working many Saturdays and Sundays.

Such employees were entitled to compensatory time off within five days of any weekend they were obliged to work, but were paid no overtime.[14] The 1964 Act was intended to remedy this, as well as other anomalies in the conditions of postal employ.[15]

Appellants say with considerable justice that on appellee's construction of the Act, the ostensible abolition of compensatory time off was a grand gesture which accomplished nothing. Under the archaic system which amazed Postmaster General Gronouski, an employee who worked the weekend was compensated by two holidays before the next weekend. Under the new, modern overtime system as construed by the present Postmaster General, that is precisely the compensation received by appellant Groettum for his weekend labors. Under the guise of a "temporary change" in his work schedule, he worked Saturday and Sunday and was rewarded with vacations on Monday and Friday. If this procedure was legal, compensatory time off was abolished in name only, and the Post Office need never pay its annual rate regulars overtime for working on off days unless it neglects to change (temporarily) their regularly scheduled workweek in advance.[16] We cannot lightly assume that Congress's mighty labors brought forth such a mouse.

Moreover, elsewhere in the Act Congress specifically provided that

Each regular employee whose regular work schedule includes an eight-hour period of service any part of which is within the period commencing at midnight Saturday and ending at midnight Sunday shall be paid extra compensation at the rate of 25 per centum of his hourly rate of basic compensation for each hour of work performed during that eight-hour period of service.[17]

Thus, if appellee's construction were correct, while an employee whose regular work schedule includes Sunday would be paid extra for his Sabbatical labors, an employee who is worked Sunday only during temporary emergencies on short notice would receive no bonus at all for his unwonted pains. This result would be contrary to the Post Office's own theory of premium pay as a device

(1) to encourage the employer to hire additional workers rather than pay a premium, and

(2) to pay a differential to scheduled employees for inconveniencing them for working beyond their schedule.[18]

We are satisfied that no such anomalous result was intended.

█ It is true, as appellee insists, that Congress was careful not to circumscribe Post Office authority to schedule weekend work. To that end it eliminated any presumption in favor of a Monday-to-Friday workweek [19] and provided only

---

14. Under the prior law, employees at or below the salary level PFS–7 could not be paid overtime for weekends worked except at the discretion of the Postmaster General, during the month of December, 39 U.S.C. § 3573(2) (A) (1964).

15. See Hearings, *supra* note 12; H.R.Rep. No. 792, *supra* note 3, at 7; S.Rep. No. 792, *supra* note 12, at 5.

16. Thus, for annual rate regulars, the only substantial change from the old compensatory-time system on appellee's reading would be that the Post Office would have to pay them overtime if it should wish to work them all seven days of any service week. Such balm as they might de-

rive from this advance must be tempered by the knowledge that the new system contains no restriction on the number of consecutive days they can be required to work, whereas the old law required two days off within five days of any worked weekend. *See* note 14, *supra*.

17. 39 U.S.C. § 3573(e).

18. Hearings, *supra* note 12 (Statement of Assistant Postmaster General Murphy).

19. Under the old law, *supra* note 14, the workweek was assumed to be Monday-to-Friday unless adjusted on account of extra work on the preceding weekend. The original House bill leading to passage of

that senior regular employees should have preference for that schedule "to the maximum extent practicable." [20] Instead of a nominal Monday-to-Friday norm often observed in the breach, we think Congress offered a regular predictable schedule,[21] including extra pay for any non-scheduled days. This scheme improves the conditions of postal employ without impeding the flow of the weekend mail. In short-term emergencies for which the regularly scheduled contingent is inadequate, the Postmaster General may schedule (1) substitutes at regular pay, (2) hourly rate regular employees at regular pay, or (3) additional annual rate regulars on their days off at overtime rates. Moreover, nothing in this opinion impairs the Postmaster General's discretion under the Act to eliminate or curtail the need for overtime work by changing the *regular* work schedules of as many employees as may be necessary—a question not involved in this case, where there

is no contention that any such changes were made.

## II

The remaining question is whether the appellant Federation is entitled to judgment in its favor as well, thereby supplying the predicate for injunctive relief. The Federation claims standing to sue on behalf of its members in order to vindicate their rights under the Salary Act.[22]

The courts have come increasingly to recognize the standing of associations to raise in some circumstances the rights of their members.[23] Where the principle of avoidance of constitutional issues is not involved, the primary requisite for a grant of standing is an interest sufficient to insure

> that the questions will be framed with the necessary specificity, that the issues will be contested with the necessary adverseness and that the litiga-

the 1965 Act provided for a "basic workweek * * * excluding Saturday and Sunday," which the Senate Committee found too restrictive. See note 3, *supra.* The Committee decided the Postmaster General should have "no statutory restriction upon scheduling employees to any 5-day workweek." S.Rep. No. 910, *supra* note 12, at 6. As we construe it, the Act imposes no such restrictions on scheduling, but only requires that overtime be paid for work done outside the regularly scheduled 5-day workweek.

20. 39 U.S.C. § 3571(d), *supra* note 2.

21. Indeed, without this assurance of regularity, annual rate regular employees who are not assigned Monday-to-Friday workweeks would be worse off under the new Act than under the old, for they must now work Saturdays or Sundays or both as a matter of course, whereas formerly they worked weekends only when the needs of the service required.

22. The Federation also argues that its "collective bargaining" agreement with the Post Office incorporates the Salary Act and that it therefore has standing to sue to enforce the provisions of the agreement to which it was a party. In view of our disposition of its alternate argument, we

do not reach the questions of whether the Post Office is in breach of its agreement and whether, if so, a court would have jurisdiction to enforce against the Government an agreement authorized only by an Executive Order issued under 5 U.S.C. § 7301. *Cf.* Manhattan-Bronx Postal Union v. Gronouski, 121 U.S.App. D.C. 321, 350 F.2d 451 (1965), cert. denied, 382 U.S. 978, 86 S.Ct. 548, 15 L. Ed.2d 469 (1966); National Ass'n of Int. Rev. Employees v. Dillon, 123 U.S.App. D.C. 58, 356 F.2d 811 (1965). *But see* Forkosch, Executive Order 10988: The Sovereign's Immunity, 22 N.Y.U.Intra.L. Rev. 1 (1967).

23. *E. g.,* NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); NAACP v. Alabama, 357 U.S. 449, 78 S. Ct. 1163, 2 L.Ed.2d 1488 (1958); Smith v. Board of Education, 365 F.2d 770 (8 Cir. 1966); MacArthur Liquors, Inc. v. Palisades Citizens Ass'n, '105 U.S.App. D.C. 180, 265 F.2d 372 (1959); Buford v. Morganton City Board of Education, 244 F.Supp. 437 (W.D.N.C.1965). *See also* International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) AFL-CIO v. Hoosier Cardinal Corp., 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966).

tion will be pursued with the necessary vigor * * *.[24]

Thus, we have allowed associations to assert their members' interests when the "association is an authorized spokesman organized to promote these interests for its individual members."[25] In such cases, absent evidence to the contrary, it is reasonable to assume that the representative speaks effectively for his constituency.[26]

▮ The appellant Federation is recognized by the Post Office Department as the exclusive representative of Departmental employees.[27] It is charged with representing the interests of all postal employees without discrimination[28] and, in particular, with processing their grievances arising under the Salary Act through all stages of internal administrative review.[29] Indeed, it has participated intimately, through agreements and consultations with the Post Office, in the very implementation of the Act.

There is no reason to doubt that, as regards the matter at bar, it fully and effectively represents the interests of at least large numbers of its members.[30] In the circumstances of this case, we think it artificial and pointless to cut off its representative functions at the courthouse door.[31]

▮ Appellee protests that, notwithstanding, the Federation is not a "real party in interest" under F.R.Civ.P. 17(a). Our decision that the Federation has standing to sue, however, is dispositive of an objection under 17(a).[32] That rule was not thought to bar suit in any of the above-cited cases in which associations had standing to sue on behalf of their members.[33] Though not articulated in those cases, the reason appears to lie in the limited purpose of the rule to protect defendants against a subsequent suit on a cause of action previously adjudicated with another plaintiff.[34] It

24. Flast v. Cohen, 392 U.S. 83, 106, 88 S.Ct. 1942, 1955, 20 L.Ed.2d 947 (1968) ; Curran v. Clifford, U.S.App.D.C. (No. 21,040, decided December 27, 1968) (slip opinion, p. 6.).

25. Citizens Ass'n of Georgetown v. Simonson, 131 U.S.App.D.C. ——, 403 F.2d 175 ; Curran v. Clifford, *supra* note 24; MacArthur Liquors, Inc. v. Palisades Citizens Ass'n, *supra* note 23.

26. To what extent a judgment obtained by the representative would be *res judicata* as to members whose interests might diverge is a difficult question which we need not resolve. *See generally* 1B Moore, Federal Practice § 0.411 [12] n. 36 (2d edit. 1965).

27. Pursuant to Section 6 of E.O. 10988, 27 Fed.Reg. 551, 553 (1962).

28. E.O. 10988 § 6(b), *supra* note 27.

29. It appears, however, that individual employees may process their own grievances if they wish. *See* E.O. 10988 § 3(c) (1), 27 Fed.Reg. at 552.

30. Its standing does not depend on any unanimity of interest in the matter at bar on the part of all its members. Citizens Ass'n of Georgetown v. Simonson, *supra* note 25 ; MacArthur Liquors, Inc. v. Palisades Citizens Ass'n, *supra* note 23.

The parties agree that the rule of law decided in appellant Groettum's case will govern the similar grievances of other annual rate regular employees.

31. Compare the observation of the Supreme Court in allowing a union to enforce the contract rights of its members under Section 301 of the Labor Management Relations Act of 1947, that

the union's standing to vindicate employee rights * * * implements no more than the established doctrine that the union's role in the collective bargaining process does not end with the making of the contract.

UAW v. Hoosier Cardinal Corp., *supra* note 23, 383 U.S. at 700, 86 S.Ct. 1107, 1110. *See also* the dissenting opinion of Justice Douglas in Ass'n of Westinghouse Salaried Employees v. Westinghouse Elec. Corp., 348 U.S. 437, 465–467, 75 S.Ct. 489, 99 L.Ed. 510 (1955) (overruled in Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962), and UAW v. Hoosier Cardinal Corp., *supra*.

32. Smith v. Board of Education, *supra* note 23, 365 F.2d at 777.

33. *Supra*, note 23.

34. In its origin the rule concerning the real party in interest was permissive in purpose : it was designed to *allow* an

does not bar a suit by a bona fide representative on behalf of real parties in interest which will have the effect of *preventing* a multiplicity of suits.[35]

We reverse and remand to the District Court with instructions to enter judgment in accordance with this opinion.

Reversed and remanded.

assignee to sue in his own name. That having been accomplished, the modern function of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to ensure generally that the judgment will have its proper effect as res judicata.

Committee Note of 1966 to Amended Rule 17(a), 3A Moore, Federal Practice § 17.-01[8] (2d edit.1967). Even if not all Federation members would necessarily be barred from subsequent litigation over the matter at bar, see note 26, *supra*, appellee is protected from suit on as many potential individual causes of action as the number of members the Federation effectively represents. Thus, from the standpoint of the purpose of the rule, allowing the union to sue is all to appellee's advantage.

35. *See* note 34, *supra*.

Nor is a suit on behalf of members barred because the Federation cannot meet the requirements of F.R.Civ.P. 23 (a) for a class action. Smith v. Board of Education, *supra* note 23, 365 F.2d at 777.

Appellee also contends that this suit is precluded by the terms of E.O. 10988, *supra* note 27, which provides in Section 6(b) that an agency's obligation to permit union participation in agency administration

shall not be construed to extend to such areas of discretion and policy as * * * the assignment of its personnel.

27 Fed.Reg. at 554. But this provision plainly does not affect a union's standing to sue on such matters when they have been removed from agency discretion by statute.