**Dalton BURNS, President of the New York State Branch of the National Association of Postal Supervisors ("N.A. P.S."), et al., Plaintiffs,**

v.

**The UNITED STATES POSTAL SERVICE et al., Defendants.**

**No. 73 Civ. 2444.**

United States District Court,
S. D. New York.

Aug. 1, 1974.

624

Donald F. Menagh, New York City, for plaintiffs; Irwin Geller, New York City, of counsel.

Paul J. Curran, U.S. Atty, S.D.N.Y., New York City, for defendants; Taggart Adams, Asst. U.S. Atty., of counsel.

METZNER, District Judge:

Before the court for decision are cross-motions for summary judgment pursuant to Rule 56, Fed.R.Civ.P.

This is an action arising under the Postal Reorganization Act of 1970, 39 U.S.C. § 101 et seq. (Reorganization Act). Plaintiffs are sixteen supervisory employees of the United States Postal Service (Postal Service), who received certain compensation in April 1973 for which no contributions were made to the Civil Service Retirement Fund (Retire-

ment Fund). Suing for themselves and others similarly situated, they seek a declaration that defendants have violated the Reorganization Act by refusing to treat this compensation as "basic pay," and by refusing to make contributions to the Retirement Fund. They also seek an order directing that such contributions to the Retirement Fund be made, and that basic pay be recomputed for the period from November 14, 1972 through March 3, 1973.

As a result of wage increases granted to the rank and file employees of the Postal Service in July 1971, the supervisory personnel, like the plaintiffs, were actually earning less than these employees. Therefore, the Postal Service issued Postal Service Order 72–3 on June 16, 1972, to provide a comparable pay increase and cost-of-living adjustment for the plaintiff class. These increases were mandated by 39 U.S.C. § 1004(a).

When this Order was issued, the nation was in the midst of Phase Two. Accordingly, any increases in compensation required prior approval of the Federal Pay Board. Postal Service Order 72–3 stated that its effective date of July 8, 1972 was conditioned on Pay Board approval of the "necessary pay adjustments" contained therein.

Subsequently, the Pay Board rejected the Postal Service's application to pay these increases on the ground that postal supervisory employees had already received an increase during the twelve months prior to the 1972 request for approval.

In November 1972, the Postal Service filed an application with the Pay Board for an exception to the wage ceilings then in effect for the period beginning November 11, 1972. It sought a general increase of $500 in the salary of the postal supervisors, as well as a cost-of-living adjustment of $166 per year. On February 15, 1973, the Pay Board granted the Postal Service permission to make certain "pay adjustments" not to exceed 5.9 per cent retroactive to November 14, 1972.

On March 20, 1973, the Postal Service issued Postal Service Order 73–1 granting postal supervisors a "salary increase" of $500 per year and a cost-of-living increase of $166 per year, to be effective March 3, 1973. In addition, the Order provided that the cost of living adjustment was not to be considered "an increase in basic compensation," and was "not applicable to benefit plans determined with respect to basic salary such as life insurance and retirement benefits."

It also provided for the lump-sum payment of compensation for the period between November 14, 1972 and March 3, 1973, which it denominated an "equalization payment," and which was not to be considered as basic pay for retirement and insurance purposes.

Under Section 1005(d) of Title 39, supervisory employees of the Postal Service are covered by the civil service retirement provisions of Chapter 83 of Title 5. In addition, these statutes require the Postal Service to "deduct and withhold 7 per cent of the *basic pay* of an employee," and to contribute an equal amount out of its own funds. (Emphasis added.)

As a result of the Postal Service's alleged improper classification of the equalization payment and the cost-of-living adjustment as nonbasic pay, plaintiffs claim that the Postal Service's contributions to the Retirement Fund for the period between November 14, 1972 and March 3, 1973 were not as much as they should have been.

In addition to the claimed loss of retirement benefits, plaintiffs also allege that the Postal Service's refusal to treat the equalization payment as basic pay deprived them of additional "premium wages" for overtime, night differential and Sunday work. Each of these premium payments is based on an employee's annual base pay. Plaintiffs have made a random sample of work records for the

period between November 14, 1972 and March 3, 1973 and have determined that, because of the holiday season, an average supervisor worked approximately 60 hours in overtime, 240 to 400 night hours, and a varying number of Sundays.

Both parties have agreed that under the Reorganization Act, the Postal Service's authority to "set and classify the compensation and benefits of all officers and employees," is a matter of discretion. The threshold question we must consider, however, is whether the exercise of that discretion is subject to judicial review.

In its brief, the Postal Service maintained that its decision to classify the compensation in this case as nonbasic pay was a rational exercise of discretion which is reviewable by the court. At oral argument, however, the Postal Service argued for the first time that its action is not reviewable, citing Panama Canal Co. v. Grace Line, 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958).

The *Panama Canal* case stands for the proposition that certain agency decisions which Congress has committed to the agency's discretion, such as the setting of tolls for ships traversing the Panama Canal, involve "questions of judgment requiring close analysis and nice choices," and are not subject to judicial review under the Administrative Procedure Act (APA). 356 U.S. at 318, 78 S.Ct. at 758.

Such a claim must be rejected in this case. First of all, the *Panama Canal* decision, which has been described by this Circuit as "inscrutable" (Langevin v. Chenango Court, Inc., 447 F.2d 296, 303 (2d Cir. 1971)), is inapplicable to our situation. Section 410 of the Reorganization Act states that "no Federal law, . . . including the provisions of chapters 5 and 7 of title 5, shall apply to the exercise of the powers of the Postal Service." Chapters 5 and 7 are the judicial review provisions of the APA.

■ The fact that the APA is not applicable, however, does not indicate a congressional desire to foreclose judicial review of actions, such as the classification of compensation and benefits. The Supreme Court has repeatedly cautioned that "preclusion of judicial review of administrative action adjudicating private rights is not lightly to be inferred," (Barlow v. Collins, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970)), and that "judicial review . . . will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress," (Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)).

■ There is nothing in the legislative history of the Reorganization Act which suggests that Congress either impliedly or expressly intended to commit the subject matter of this suit entirely to the Postal Service's discretion. In fact, just the opposite conclusion may be inferred from the enactment of Section 409 which grants original jurisdiction to the district court of "all actions brought by or against the Postal Service" except suits which seek judicial review of postal rates. As to that latter category, Congress provided for original jurisdiction in the Circuit Courts of Appeals. 39 U.S.C. § 3628. The existence of a jurisdiction-conferring section like Section 409 provides the basis for maintaining a "'non-statutory' review action." Byse & Fiocca, ₊Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv.L.Rev. 308, 321, 323 (1967).

■ Secondly, unlike the *Panama Canal* case, the classification of compensation as basic pay does not appear from this case to involve a subject matter inappropriate for judicial consideration. Langevin v. Chenango Court, Inc., *supra* at 303. This is especially true because of the statutory constraints which Congress has placed on matters involving Postal employees' compensation and

fringe benefits. (See, 39 U.S.C. §§ 1003, 1004, 1005(f); *cf.*, Davis Associates, Inc. v. Secretary, HUD, 498 F.2d 385 (1st Cir. 1974)).

■ The standard for review in this case is whether the issuance of Order 73–1 was arbitrary, capricious or an abuse of discretion. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 413–416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Association of American Publishers, Inc. v. Governors of the United States Postal Service, 485 F.2d 768, 775 (D.C.Cir.1973); *cf.* Marrone v. United States Immigration and Naturalization Service, 500 F.2d 418 (2d Cir. 1974).

We turn first to the equalization payment. Defendants make two arguments why their decision to treat this payment as nonbasic pay should not be overturned. First, they claim that the payment does not meet the statutory definition of basic pay. Secondly, they argue that Order 73–1 was a rational exercise of discretion.

Order 73–1 states that the equalization payment was to be in addition to base pay. Excluded from the statutory definition of base pay is "pay given in addition to base pay of the position as fixed by law or regulation." Section 8331(3). Defendants rely on the wording of their own order to sustain their position, overlooking the fact that the issue in this lawsuit is the propriety of that order.

■ The inescapable conclusion from the sequence of events in this case from 1971 to March 1973 is that the lump sum equalization payment was in reality nothing more than the retroactive payment of base pay for work performed during the period of November 14, 1972 through March 3, 1973 (Retroactive Period). Several distinct grounds bear out this conclusion. First, the Postal Service in November 1972 had requested the Pay Board to approve a $500 per year increase in the annual salaries of the plaintiffs *to be effective November 14, 1972.* But for the Pay Board's delay in granting approval, the Postal Service would have started to treat this compensation as an increase in base pay as of November 14, 1972.

Second, the amount of the lump sum payment equalled the amount of the wages which would have been paid to each supervisor individually in the retroactive period, if the payments had commenced on November 14.

Perhaps the most telling indication, however, of the true nature of the payment is the notation on the pay stub of the April 13, 1973 equalization payment which read "Retro Pay." All of the defendants' protestations about the purpose of this payment pale in the face of this pithy phrase.

■ This finding that the equalization payment was basic pay, however, does not end our inquiry. We must also ascertain whether the decision to refrain from treating this payment as basic pay was nonetheless a rational exercise of the Postal Service's discretionary power under Section 1003. The sole justification given for its action in not treating the payment as basic pay is the administrative burden such a determination would have entailed. The affidavit of James Healy of the Postal Service's Accounting Office lists five different administrative measures which would have resulted if the payment had been treated as basic pay.

We agree with the plaintiffs that the alleged administrative burden in this case is really a makeweight argument.

First, the existence of an administrative or financial burden has traditionally never been regarded as the touchstone for depriving persons of governmental benefits which they are entitled by statute to receive. *Cf.*, Goldberg v. Kelly, 397 U.S. 254, 265, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); McDonald v. McLucas, 371 F.Supp. 837, 840 (S.D.N.Y. 1973). As potential recipients of the retirement benefits created by Congress, and premium wages, these supervisors are such persons. Any diminution in these benefits by virtue of an employer's

failure to make its proper contribution cannot be justified solely by reference to the amount of paperwork involved.

As a practical matter, this argument also lacks persuasive force since the Postal Service has only recently undertaken extensive administrative measures in another back pay case without any apparent ill effects other than inconvenience. As a result of the decision in United Federation of Postal Clerks, AFL–CIO v. Watson, 133 U.S.App.D.C. 176, 409 F.2d 462 (1969), a consent order was entered in the District Court on August 26, 1971 granting retroactive overtime compensation to over 700,000 postal employees. The administrative work encompassed by the *Watson* litigation was infinitely more complex and costly than that envisioned by the instant case because of the number of employees involved, the period of time spanned, and the fact that each employee's claim for back pay was not automatic but required a determination of separate subsidiary factual questions concerning his work schedule. In contrast, the instant suit involves at most 34,000 supervisory employees in a four-month time period for whom the compensation due was automatic.

■ A further ground for finding an abuse of discretion in this case exists because the Postal Service's actions were in derogation of the Reorganization Act. Section 1005(f) of the Act prohibits any change in the fringe benefits of Postal Service employees "which on the whole is less favorable . . . than fringe benefits in effect" on July 1, 1971. As part of the enactment of the Reorganization Act, Congress also provided in Section 9 of Public Law 91–375 for a retroactive increase of 8 per cent in the basic pay of all Postal Service employees effective as of April 16, 1970. That retroactive wage increase was treated as basic pay for retirement purposes, as well as for the purpose of recomputing and paying premium wages already paid during the retroactive period. By refusing to treat the fringe benefits in March 1973 in the same manner

as it did in 1970, it seems clear that the Postal Service has affirmatively violated its obligation under Section 1005(f) not to make such benefits less favorable than they were at the time the Act was adopted.

■ Accordingly, the Postal Service's decision to characterize the equalization pay as nonbasic pay on the facts of this case can only be regarded as an abuse of discretion. Plaintiffs are therefore entitled to summary judgment declaring the equalization payment to be basic pay and defendants are directed to make the appropriate retirement deductions and contributions required by Section 1005(f) of Title 39, and Chapter 83 of Title 5, and to recompute and pay the premium wages which are based on basic pay.

We reach a similar conclusion regarding the cost-of-living adjustment.

Defendants contend that this adjustment is excludable from basic pay for retirement purposes because it is an "allowance" as well as "pay given in addition to the base pay of the position as fixed by law or regulation." 5 U.S.C. § 8331(3). They claim that this $166 per year adjustment is analogous to allowances and differentials granted under 5 U.S.C. § 5941 to employees working outside of the continental United States in hazardous conditions, etc. The established practice with regard to those payments is that they are not to be used "in computing overtime pay, night differential, holiday pay, retirement deductions, or other additional pay, allowance or pay differential." Federal Personnel Manual § 591–41(d)(1) (1969).

The difficulty with this argument is that the Postal Service has not consistently followed this "practice" in its classification efforts. Even in this case, while the cost-of-living adjustment was treated by defendants as basic pay for retirement and insurance purposes, it was treated as basic pay for the computation of premium wages. We fail to perceive any reasonable basis for the difference in treatment.

Furthermore, there is no basis for an analogy to be drawn to a practice relevant to employment outside the United States.

■ Finally, we note that as of November 14, 1973, this cost-of-living adjustment has been treated as basic pay for retirement purposes. No reason has been given for this turnabout in construction. It only confirms the notion that the Postal Service's decision in Order 73–1 had no rational basis.

Plaintiffs are therefore entitled to summary judgment on their claim for retirement contributions on the basis of the cost-of-living adjustment, and defendants are directed to act accordingly.

The cross-motion for summary judgment dismissing the complaint is denied.

We turn now to the question of whether plaintiffs may properly maintain this suit as a class action under Rule 23, Fed.R.Civ.P.

For purposes of this motion, the definition of the class found in the complaint conveniently breaks down into two classes. The first embraces "those employees of the Postal Service employed in a supervisory capacity who have received the [equalization payment] and who are receiving and will receive the cost-of-living increase . . . all without proper contribution by the Postal Service to the Civil Service Retirement Fund" (hereinafter the retirement fund class). The second includes those Postal Service supervisory employees who received the equalization payment without "proper payment of other forms of compensation based on basic pay [i. e., premium wages] in an amount sufficient to reflect the [equalization payment]" (hereinafter the premium wage class).

■ No objection has been raised as to the viability of the premium wage class. And we conclude that it meets all of the requirements of Rule 23(a), (b)(1) and (b)(2).

As far as the retirement fund class is concerned, defendants contend that the representative parties will not adequately protect the interests of all of the purported members of the class. They claim that if plaintiffs prevail (as they have) on their claim for retirement benefits, the Postal Service will be required to deduct from each class member's salary a sum equal to 7 per cent of the equalization payment and of any cost-of-living payments they have received.

Defendants argue that these deductions create an antagonism between the named plaintiffs and other members of the class since the only supervisors who may benefit from these additional contributions are those whose "High-3" includes their salaries between November 14, 1972 and November 14, 1973. Only those supervisors who retire or resign within three years after November 14, 1973, would include this period in determining their annuities. All other supervisors, who allegedly make up the bulk of the class, would be required to pay an increased amount into the Retirement Fund without receiving any increase in subsequent retirement benefits from these deductions. It is urged that this pecuniary interest on the part of the nonretiring supervisors creates an irreconcilable conflict of interest among the class.

■ It is well settled that in order to maintain a class action, the plaintiffs must be truly representational. Madonick v. Denison Mines, Ltd., 63 F.Supp. 657 (S.D.N.Y.1974). "Unless the relief sought by the particular plaintiffs who bring the suit can be thought to be what would be desired by the other members of the class, it would be inequitable to recognize plaintiffs as representative, and a violation of due process to permit them to obtain a judgment binding absent plaintiffs." Dierks v. Thompson, 414 F.2d 453, 456 (1st Cir. 1969). Such is the instant case. In fact, it is probable that the vast majority of supervisors were actually pleased that the Postal Service gave them this additional compensation without deducting anything for retirement purposes. See, Chicago v. General Motors Corp., 332 F.Supp.

285, 288 (N.D.Ill.1971). In affirming the denial of class status in Phillips v. Klassen, 502 F.2d 362 (D.C.Cir.1974), the Court of Appeals observed:

"When, as here, there is complaint as to injury from an allegedly invalid action of a Government official and the action may be taken as conferring economic benefits or working economic harm, depending on the circumstances of the individual, the foundations of maintenance of a class action are undermined." *Id.* at 367.

Consequently, class action treatment is inappropriate for the retirement class. *Cf.*, Hansberry v. Lee, 311 U.S. 32, 44, 61 S.Ct. 115, 85 L.Ed. 22 (1940); Free World Foreign Cars, Inc. v. Alfa Romeo, 55 F.R.D. 26, 28–29 (S.D.N.Y.1972); Maynard, Merel & Co. v. Carcioppolo, 51 F.R.D. 273 (S.D.N.Y. 1970).

Settle order.