The PEOPLES GAS LIGHT AND COKE COMPANY, Plaintiff,

v.

UNITED STATES POSTAL SERVICE et al., Defendants.

No. 81 C 146.

United States District Court,
N. D. Illinois, E. D.

Feb. 19, 1981.

---

**2.** See F.R.Civ.P. 7.

**3.** See n.1.

Thomas Campbell and Michael E. Barry, Gardner, Carton & Douglas, Chicago, Ill., Joseph M. Wells, Paul E. Goldstein, Thomas M. Patrick, Carolyn E. Ramm, Peoples Energy Corp., Chicago, Ill., for plaintiff.

Mary Anne Mason, Asst. U. S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Plaintiff The Peoples Gas Light and Coke Company ("Peoples Gas") filed this action January 12, 1981 for injunctive declaratory and mandamus relief against the United States Postal Service ("USPS") and several individual officials of USPS[1] arising from the contemplated awarding of contracts for

---

1. Individual defendants are Postmaster General William F. Bolger ("Bolger"), Regional Postmaster General John P. Doran ("Doran") and Regional Director of Real Estate and Buildings Department E. P. Gailmard ("Gailmard").

work under the USPS solicitation for bids for an electric boiler plant for the Chicago Main Post Office. USPS and its officials are alleged to have violated a number of Federal regulations and procedures in the decision-making process that led to the invitation for bids. Because the invitation for bids specifies an electrically powered boiler plant for the Chicago Main Post Office, Peoples Gas (the assured supplier of the natural gas that would have to be purchased as fuel had the specifications called for gas-fired boilers) alleges it would sustain economic injury in the form of loss of business. It also asserts threatened injury to taxpayers and postal rate payers stemming from the same decision. Jurisdiction is predicated on 28 U.S.C. § 1339 and 39 U.S.C. § 409[2] and is challenged by defendants.

Defendants moved to dismiss or alternatively for summary judgment, on jurisdictional and other grounds. This Court took that motion under advisement and proceeded to hearing on Peoples Gas' motion for preliminary injunction February 3–5, 1981.[3]

For the reasons stated in this memorandum opinion and order, defendants' motion to dismiss or alternatively for summary judgment is denied and Peoples Gas' motion for preliminary injunction is granted.[4]

## Facts[5]

Ever since it was built in 1933, the Main Post Office at 433 West Van Buren Street, Chicago Illinois, and its surrounding buildings have been heated with steam purchased from Chicago Union Station Company ("Union Station"). In September 1979 Union Station notified defendants of the cancellation of the steam contract effective September 30, 1982. Defendants then commissioned the well-known architectural-engineering firm of Perkins & Will ("P&W") to conduct a study to evaluate available heating source alternatives (as is permissible for the government's letting of contracts for professional services, P&W was selected after a solicitation of firms interested in the work, but the price for the job was then negotiated rather than bid competitively).

**2.** In the light of 39 U.S.C. § 410(a) Peoples Gas has disclaimed the applicability of the Administrative Procedure Act, 5 U.S.C. §§ 701–06, to confer jurisdiction in the case. See *Morgan Associates v. USPS*, 387 F.Supp. 947, 950 (S.D. N.Y.1975), *aff'd on other grounds*, 511 F.2d 1223, 1225 n.3 (2d Cir. 1975).

**3.** By agreed order of January 15, 1981 defendants undertook not to award any contract pursuant to the invitation for bids until February 9. At the conclusion of the hearing February 5 this Court entered an order enjoining such award until February 15 in aid of its jurisdiction, to enable it to consider the merits of the preliminary injunction issue as well as the threshold jurisdictional questions. Because counsel for defendants confirmed that USPS had already contemplated deferring the granting of the award to February 14, the Court found it unnecessary for Peoples Gas to post a bond for the added one-day delay. On February 13 Peoples Gas moved for a ten-day extension of the Court's injunctive relief in aid of jurisdiction, inasmuch as the transcript of proceedings of the hearing was just then becoming available to the parties and the Court had to complete its opinion based on the transcript as well as its research of the issues. Counsel for USPS were unable to articulate persuasive grounds for any specific amount of damages representing the added risks to USPS resulting from the ten-day extension (all bidders re-

mained bound to USPS and could not withdraw their bids, and counsel's suggestion that a $500,000 bond was appropriate because the projected construction timetable was very tight, and the ten days would use up a substantial part of the 33-day "cushion" in that schedule, struck the Court as totally speculative and unjustified). Accordingly the Court exercised the discretion vested in it under Fed.R.Civ.P. ("Rule") 65(c) by fixing a $10,000 bond, which has been posted by Peoples Gas.

**4.** Peoples Gas has suggested that it should be entitled to permanent relief as well as to a preliminary injunction. As indicated in the text of this opinion, this Court's view of the merits is that on the present record Peoples Gas has not only a reasonable probability of success (the appropriate test for preliminary injunctive relief) but would in fact prevail. If the parties agree that no additional facts would be adduced at the hearing on the ultimate merits, either or both parties may move for an appropriate order embodying a final disposition of the action on the merits.

**5.** This section of the opinion will set out the background facts and some of the relevant detail. Other facts will be referred to where appropriate in the body of the opinion.

P&W worked closely with USPS people in developing the study, which considered a number of alternatives: tieing into the existing steam source, solar energy, a heat pump, coal plants, oil plants, low pressure gas or electric plants, combinations of low and high pressures gas and electric plants, a central high pressure gas plant and a central high pressure electric plant. All except the last two were rejected as not meriting detailed evaluation for a variety of reasons. As between the high pressure gas and electric plants, the June 17, 1980 P&W study ("P&W Study," Pl. Ex. 7) found that the *gas* plant was economically superior but recommended that the *electric* alternative be chosen.

While the P&W Study was still in the works (this was particularly true of the economic analysis, which was not then as far advanced as the rest of the Study), the Chicago USPS people held a two-day meeting May 14 and 15, 1980 to brief the prospective "validators" (persons selected as their representatives by the Washington department heads of USPS who sit on the Capital Investment Committee that recommends decisions to the USPS Board of Governors). At that meeting the decision was made to opt for the electric plant, though P&W had not yet completed its Study. After issuance of the P&W Study, the local Operational Requirements Branch of USPS completed its Decision Analysis Report dated July 15, 1980 (the "Analysis," Pl.Ex. 6), updating its May 16, 1980 draft of that report (the "Draft Analysis," Pl.Ex. 5) to conform to the P&W Study. As had the P&W Study, the Analysis at pages 17–18 found that "construction of a gas-fired boiler is economically superior to an electric boiler over the analysis period," but it eliminated that alternative and opted for the electric system. Indeed, that portion of the Analysis was identical to page 13 of the Draft Analysis, which had reflected the gas alternative as having been eliminated as of May 1980, except that the Draft Analysis had contained no reference to the economic superiority of the gas alternative.

Following preparation of the Analysis, the USPS Capital Investment Committee recommended adoption of the P&W Study and Analysis to the Board of Governors of USPS, an 11-member board consisting of nine Presidential appointees plus the Postmaster General and Deputy Postmaster General. On August 5, 1980 the Board of Governors adopted those recommendations.

When Peoples Gas learned of the USPS decision to utilize electric boilers, it sought a meeting with USPS officials and sought to prepare an analysis of the superiority of the gas alternative (as it viewed it), although it was materially handicapped in that respect by not having the P&W Study on which the USPS decision was based. On October 2, 1980 Peoples Gas representatives met with USPS officials (including defendant Gailmard) and presented a study comparing the fuel costs of gas and electric boilers. At that meeting Peoples Gas requested but was denied a copy of the P&W Study. Peoples Gas promptly filed two Freedom of Information Act ("FOIA") requests seeking the P&W Study and all other documents relating to a decision on the heating source alternatives.

On October 22, 1980 Peoples Gas representatives met with defendant Gailmard and P&W representatives and were furnished a response to the Peoples Gas presentation. Although a major criticism by USPS was Peoples Gas' use of data differing from that used by P&W (Peoples Gas renewed its request at the meeting for a copy of the P&W Study and was again rebuffed), P&W confirmed that on its own figures the initial annual fuel cost savings from using gas would exceed $1 million.

On October 28 the Peoples Gas FOIA requests succeeded in dislodging copies of the P&W Study and the Analysis. Peoples Gas then became aware that the basis for rejection of the gas alternative appeared to be an environmental concern over the height of the stack that would be required for gas boilers but not for electric boilers (even though Peoples Gas had previously advised P&W, and USPS official Gailmard was fully aware, that variances for such stacks were obtainable from the City of

Chicago as a matter of course). Peoples Gas then sought and obtained written confirmation of the availability of such a waiver from the City of Chicago and wrote defendant Doran November 24, 1980, apprising him that the environmental concerns had been misconceived and requesting a meeting. Doran refused by a December 1 letter.

On December 5, 1980 Peoples Gas sought review at a higher level within USPS by meeting with Assistant Postmaster General Roger Craig, pointing out in its hand-delivered letter that the P&W Study's economic analysis had greatly understated the cost advantage of the gas alternative and that P&W had been mistaken on the environmental factor as well (the height of any required stack). Assistant Postmaster General Craig responded by letter of December 10, stating that "further inquiries and meetings would be inadvisable in that it does not appear sufficiently likely they would produce information pointing conclusively in the direction of reversing our prior decision to justify the activity involved." Peoples Gas promptly wrote to Postmaster General Bolger December 15, 1980 and contemporaneously prepared a protest with USPS under the Postal Contracting Manual.

In the meantime, on November 21, 1980 USPS had issued invitations to bid for the construction of a steam boiler plant powered by electricity, pursuant to the Board of Governors' decision. As a result of the protest filed by Peoples Gas, the bid opening was delayed two weeks to January 20, 1981. Because it was apparent that all possibility of review at the administrative level had been exhausted and that judicial action would be necessary to resolve the matter, Peoples Gas filed suit January 12, 1981.

### Jurisdiction and Standing

■ At the threshold this Court must of course determine whether it has jurisdiction over this action. Peoples Gas relies for that purpose on two statutes:

> The district court shall have original jurisdiction of any civil action arising under any Act of Congress relating to the Postal Service (28 U.S.C. § 1339, "Section 1339").
>
> Except as provided in section 3628 of this title [inapplicable to this case], the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service (39 U.S.C. § 409(a), "Section 409(a)").

As for the first of these, *National Ass'n of Postal Supervisors v. USPS*, 602 F.2d 420, 429 (D.C.Cir.1979), is directly in point. There the Court of Appeals for the District of Columbia Circuit held squarely "that the jurisdictional provision in 28 U.S.C. § 1339 provides a basis for hearing this action." It went on to state that although subject matter jurisdiction was thus vested in and correctly assumed by the district court, it was also necessary to determine whether judicial review of the agency action was foreclosed on other grounds (*id.* at 429–30, citations omitted):

> The existence of a jurisdiction-conferring statute does not alone create a right of action for judicial review of agency action. Such a statute triggers the well-established presumption favoring judicial oversight of administrative activities, . . . but that presumption operates differently depending on a judicial determination of congressional intent, the functional needs of the agency for flexibility and discretion, and the capacity of the courts to resolve the issues presented them. Hence the presumption can be overcome by evidence of a legislative intent to foreclose judicial intervention, . . . or a finding that the issues involved are unsuitable for judicial determination owing to the character of the discretion delegated to the administrative agency, . . . . Nonreviewability is not to be casually inferred. The case against judicial scrutiny of an agency's exercise of discretion must be a compelling one. . . . Yet assuming the absence of a constitutionally-based claim, if Congress clearly intended to preclude or restrict review, if judicial interference

would imperil the policies underlying the lawmakers' decision to delegate the discretion, if the nature of the administrative discretion is such that the conventional tools of judicial analysis are unsuited to an examination of its exercise, then a court is not at liberty to disregard those limitations and proceed to substitute its own judgment for that of the administrative agency.

As will be evident from this Court's substantive discussion in this opinion, it has exercised its functions in accordance with both the letter and spirit of that decision.

■ Although one entry into the lists is enough, Section 409(a) also independently vests this Court with jurisdiction. In an analogous situation, *Burns v. USPS*, 380 F.Supp. 623, 626 (S.D.N.Y.1974), held that Section 409's grant of original jurisdiction was substantive in its impact, negating any conclusion "that Congress either impliedly or expressly intended to commit the subject matter of this suit entirely to the Postal Service's discretion." Even though *Burns* itself was vacated (the litigation having been settled by consent decree), it has been followed by a series of decisions to the same effect, such as *Withers v. USPS*, 417 F.Supp. 1, 3 (W.D.Mo.1976); *Oates v. USPS*, 444 F.Supp. 100, 102 (S.D.N.Y.1978); *Neal v. USPS*, 468 F.Supp. 958, 960 (D.Utah 1979); and *Pearlstine v. USPS*, 469 F.Supp. 1044, 1046 (E.D.Pa.1979). There are thus two separate and independent grounds on which the USPS effort to avoid this Court's jurisdiction must be rejected.

■ In addition to its arguments of lack of jurisdiction, USPS urges that Peoples Gas has no standing in this action, first because it has no direct stake in the contract award at issue (it is not of course a disappointed bidder, but rather a disappointed prospective supplier of fuel that would be employed if the gas-fired rather than electric boilers were specified) and second because there is no *assurance* that the gas alternative will in fact be chosen if Peoples Gas prevails in requiring a new review of the matter by USPS. Neither argument withstands analysis.

As to the first argument, it seeks to exalt form over substance. Peoples Gas is after all a public utility, the possesssor of the legal monopoly over the supply of gas for space heating purposes in Chicago. USPS' (and P&W's) economic analysis confirms that the *major* economic element in the cost of the heating system over the 20-year analysis period is *fuel*, rather than construction or maintenance. It would make no sense, either practically or conceptually, to recognize standing for a bidder on the construction contract (see such cases as *Airco, Inc. v. Energy Research and Development Adm'n*, 528 F.2d 1294, 1296 (7th Cir. 1975); *Rossetti Contracting Co. v. Brennan*, 508 F.2d 1039, 1042 (7th Cir. 1974) [6]), but not for Peoples Gas as the *assured* supplier of gas if USPS reversed its decision on the kind of heating plant to be constructed.

As for the second argument, it proves too much. It would preclude a court from considering any suit in which the claim was that a public official had failed or refused to exercise discretion in an area in which he or she was obligated to do so—a familiar basis for mandamus jurisdiction. In such circumstances the Court will not compel discretion to be exercised in a particular manner, but will rather compel the official to carry out his or her duty to exercise such discretion. Obviously the complaining party will benefit from one means of exercise though not the other—a situation entirely parallel to that in this case—but the lack of certainty of benefit is not considered to defeat standing. This case fits comfortably within the basic standing principles most recently reconfirmed in *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99–100, 99 S.Ct. 1601, 1607–1608, 60 L.Ed.2d 66 (1979), approving *Warth v. Seldin*, 422 U.S. 490, 498 ff. 95 S.Ct. 2197, 2204, 45 L.Ed.2d

---

**6.** Both those cases were decided under the Administrative Procedure Act, which does not apply here. But the same principles expressed in *National Ass'n*, *Burns*, and the other cases discussed earlier, upholding review of USPS administrative actions, would confer standing on a disappointed bidder.

343 (1975). Peoples Gas' prospective loss of business, resulting from the USPS decision favoring the electric power alternative, is comparable to the possible future loss of profits that was found sufficient to confer standing in *Ass'n of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

■ One other point should be mentioned on the standing question. Once as here a plaintiff has demonstrated the potential "injury in fact" necessary to confer such standing, that plaintiff can *also* assert the public interest in support of its own claim.[7] *Sierra Club v. Morton,* 405 U.S. 727, 737, 92 S.Ct. 1361, 1367, 31 L.Ed.2d 636 (1972).

### Laches

■ USPS asserts laches as a defense to this action, stating that as of November 21 the rights of the third parties became implicated when bids were invited, and citing *John W. Danforth Co. v. Veterans Administration,* 461 F.Supp. 1062, 1069 (W.D.N.Y. 1978). This Court finds that position somewhat extraordinary, given the facts that (1) the bulk of the time once the USPS decision first became known was occupied in Peoples Gas' unsuccessful efforts to find out just what they had to counter in order to persuade USPS that it had made (as Peoples Gas viewed it) an incorrect decision and (2) Peoples Gas' diligent efforts to obtain reconsideration at all levels of the USPS ladder.

USPS refused to furnish the P&W Study, the Analysis or any other decision-making information in response to several requests from Peoples Gas, thus forcing Peoples Gas to seek relief under the FOIA. Peoples Gas found itself in the Kafkaesque position of having to work up its own economic analysis in the blind (without knowing the assumptions and analysis employed by P&W, which Peoples Gas would have to meet for any effective comparison). Those efforts,

including meetings with the Chicago personnel and P&W representatives, carried into October and November, after which Peoples Gas went up the line of authority—convinced that if it could persuade the responsible officials to review the matter in light of the demonstrated errors by P&W and the Chicago personnel, it could cause the determination to be reviewed and reversed.

When this Court inquired at the hearing whether the government argument was that Peoples Gas should have instituted legal action immediately rather than seeking to persuade USPS of the error of its ways, government counsel disavowed that position. In the circumstances of this case, the statement in *Danforth,* 461 F.Supp. at 1069–70, might appropriately be paraphrased for this case:

> While plaintiff could have brought the action at an earlier time to protest the contract award to Hamberger, it did so with reasonable diligence after learning of the futility of its administrative remedies.

This Court cannot find either that the Peoples Gas delay was unreasonable or that any claimed detrimental reliance by the government was justifiable under the circumstances.

### Preliminary Injunction Standards

■ No disagreement exists as to the criteria applicable to preliminary injunctive relief, as reaffirmed by our Court of Appeals last year in *In re Uranium Antitrust Litigation,* 617 F.2d 1248, 1261 (7th Cir. 1980):

> (1) The plaintiffs have no adequate remedy at law and will be irreparably harmed if the injunction does not issue;
>
> (2) The threatened injury to the plaintiffs outweighs the threatened harm the injunction may inflict on the defendant;

7. This is so even though public interest alone will not confer standing on a plaintiff absent a degree of harm different from that shared equally by all or a large class of citizens. *Gladstone,* 441 U.S. at 100, 99 S.Ct. at 1608.

(3) The plaintiffs have at least a reasonable likelihood of success on the merits; and

(4) The granting of a preliminary injunction will not disserve the public interest.

Nor is it difficult to apply those standards to this case.

On the first point, USPS has conceded the absence of an adequate remedy at law (page 14 of its Memorandum in support of its own motion). That factor is clearly linked with irreparable harm, for the award of the construction contract would create vested rights that would make reaching and dealing with the ultimate merits equivalent to unscrambling an omelet.

As for the balancing of harms, if Peoples Gas is right on the merits, the potential harm faced by Peoples Gas is the loss of an immensely significant customer for fuel, while the potential harm faced by the public is measured in many millions of dollars, representing the economic superiority of gas over electricity. Against those must be weighed the potential harm to USPS—the difficulty of meeting a tight timetable for construction of the plant. But that harm (again assuming Peoples Gas to be correct) is the result of USPS' breaching of its own regulations and clearly specified duties. That kind of bootstrap argument does not compel sympathy, and the harm can in any case be mitigated (if not avoided entirely) by expediting the decisional process and the contract letting if the decision is changed, or by arranging for alternative heat sources, either with Union Station or otherwise on an interim basis if the decision remains the same.[8]

This opinion skips the next criterion, which must be considered at greatest length, to comment only briefly on the "public interest" consideration. That element has already been encompassed within the prior discussion and need not be repeated. Suffice it to say that the entire gravamen of Peoples Gas' complaint is that USPS has breached its public interest obligations in its handling of the matter, so that if Peoples Gas can prevail on the merits-related standard, it must automatically satisfy the public interest requirement as well.

*Likelihood of Success on the Merits*

Peoples Gas attacks USPS across a wide front, or perhaps more accurately a series of fronts. But consideration of the merits is simplified by the fact that this Court will *not* substitute its judgment for that of the postal authorities. Thus if and to the extent that the argument comes down to whether the officials exercised their judgment reasonably, Peoples Gas must be denied any relief.

But to a major extent Peoples Gas' position differs in kind and not merely in degree from the mere assertion of disparate judgments. It urges that USPS failed to follow its own standards, fatally infecting the entire decisional process. On that score, given the record before the Court, it would be an understatement to characterize Peoples Gas' likelihood of success on the merits as only "reasonable."

It must be remembered that P&W's analysis, accepted by USPS,[9] is that gas is economically superior to electricity.[10] That be-

8. It is true that Union Station's General Manager Freund stated (Dep. 64) that they fully expect USPS "to go off our line on September 30, 1982." However, Gailmard testified (Tr. 60) that Union Station had given verbal assurances of accommodation for another 30 or 60 days or so if necessary.

9. Gailmard testified (Tr. 66) that USPS had delegated to P&W the task of conducting the economic comparison—the determination of which alternative was most cost effective—in addition to the preparation of the environmen-

tal assessment. USPS did not conduct any study independent of P&W's in either area.

10. This is true even without taking into consideration factors, referred to later in this opinion, that indicate the P&W figures were skewed in favor of electricity in making their economic comparison. Wholly without reference to items advanced by Peoples Gas that might be termed judgmental, the economics plainly favor gas to a greater extent than the P&W Study's comparison. On one item alone, P&W's plain error in calculating the initial annual cost of gas as fuel, the mistake appears to have been

ing the case, USPS' own regulations require that gas be chosen unless the selection of electricity is "fully justified," as stated in USPS Pub. 191, ¶3.14 (part of the Capital Investment Criteria chapter):

Usually, the most cost effective solution that meets capacity and environmental standards is selected. Other alternatives recommended or selected in lieu of the most cost effective one must be fully justified.

Unfortunately the first stage in the USPS decisional process, on which every subsequent step must be considered to have relied—the decision by Regional Director Gailmard—was flawed by his application of an approach to environmental considerations that Gailmard did not know had been reversed back in November 1979, over six months before Gailmard acted in ignorance of the change.

Gailmard confirmed at the hearing that as far as he was concerned the decision for an electric installation had already been made by the May 14–15, 1980 meeting, a month before the P&W Study with its economic analysis had been completed.[11] That decision was based on Gailmard's stated inability to file a *negative* impact decision (that is, a decision regarding the lack of environmental impact of a gas system), which inability would automatically require the filing of an environmental impact statement ("EIS"). In turn, the delays that would necessarily be forced by an EIS

meant that the electric installation was the only one that could be assured of meeting the September 30, 1982 date by which the Union Station source of heating will have to be replaced. Accordingly the economic analysis, which as already stated ultimately favored the gas system, was entirely irrelevant in Gailmard's view.

When the P&W Study was issued a month later, the USPS Decision Analysis Report (the "Analysis") was put in final form for issuance July 15, 1980, confirming the conclusion previously reached by Gailmard two months earlier. It is significant that the Draft Analysis prepared after the May personnel meeting (a month before the P&W Study) had already stated (Pl. Ex. 5 at 13):

*GAS BOILER PLANT*

This option would present a negligible environmental impact and possible aesthetic impact because a stack would be required.[12]

The City of Chicago has advised in a letter (dated May 13, 1980), that construction of a steam generating plant in the vicinity of Harrison and Canal Streets, or at almost any other location in that vicinity, must be analyzed carefully in terms of environmental impacts, both actual and potential, attendant to such a facility. Also, the City states, any major projecting structure (such as a stack), and

---

of the magnitude of $25 million over the 20-year analysis period.

11. Notes of the meeting kept by Gerald Bugen of USPS, Pl. Ex. 3, stated under "Alternatives":
Gas—EIS [Environmental Impact Statement] is possible result.
—Gailmard does not want it to be a viable alternative because there [sic] no time to do an EIS.
—A/E [Architectural/Engineering, referring to P&W] study will do economic analysis showing gas.
Under "Alternate eliminated," Bugen listed "gas" with the statement "environmental impact statement likely would delay project." Although Gailmard denied at the hearing that he had made the first-indicated statement, it is entirely consistent with his testimony during the hearing (Tr. 75) that during the May meeting he and the other USPS people had already

decided in favor of electricity and that, given the environmental situation as he viewed it, gas could not really be considered as an alternative. Arthur Hambric of USPS, who was responsible for preparing the Analysis, also testified (Tr. 46–47) that gas had been eliminated as an alternative as of May 1980, though the comparative figures had not yet been obtained, because of environmental considerations.

12. This conclusion was toned down even further in the P&W Study, Pl. Ex. 7 at 99, which stated that a gas boiler plant "would present negligible environmental and aesthetic impact" (it should be remembered that USPS had delegated the environmental assessment function entirely to P&W). As for the requirement of a stack, subsequent discussion in this opinion deals with the serious errors by P&W and USPS in that regard.

the potential impact on air quality from combustion of fossil fuels on site might collectively indicate a need for an environmental impact analysis.

This alternative was eliminated due to the possibility that an Environmental Impact Statement would be required and this action would delay the completion of the proposed boiler plant to provide an alternate source of steam.

As already indicated, when the final Analysis was prepared after the P&W Study had verified the economic superiority of a gas-fired system, it essentially repeated the language of the Draft Analysis except that it converted the possibility of an aesthetic problem due to the stack height into a certainty (a knowingly incorrect statement, as will be discussed later) and confirmed the elimination of the gas alternative despite its economic advantage (Pl. Ex. 6 at 17–18):

*Gas-Fired Boiler Plant*

This option would present a negligible environmental impact, according to the Perkins and Will engineering report; an aesthetic problem would exist with the height of the stack.

However, the City of Chicago has advised in a letter (dated May 13, 1980), that construction of a steam generating plant in the vicinity of Harrison and Canal Streets or at almost any other location in that vicinity, must be analyzed carefully in terms of environmental impacts, both actual and potential, attendant to such a facility. Also, the City states, any major projecting structure (such as a stack), and the potential impact on air quality from combustion of fossil fuels on site might collectively indicate a need for an environmental impact analysis.

Although construction of a gas-fired boiler is economically superior to an electric boiler over the analysis period, this alternative was eliminated due to the possibility that an Environmental Impact Statement would be required, and this action would delay the completion of the proposed beyond the September 1982 cut-off date for providing replacement source of steam.

There is no question that the same conclusive effect of the environmental factor in the decision to reject the gas alternative ran all the way up the USPS chain of command. Regional Postmaster General Doran testified, after having been shown the sentence of the Analysis referring to the economic superiority of the gas-fired boiler but its elimination due to the possibility that an EIS would be required (Dep. 35–36):

Q. Are you familiar with that paragraph?

A. I sure am.

Q. Did you discuss that with your subordinates prior to signing off on the revision?

A. I'm sure I did.

Q. Do you recall that conversation?

A. Not specifically, but I could give it to you in general purposes, that one of the very key requirements was to meet the deadline to maintain a heat supply within the Chicago Post Office. That was paramount. That had to be accomplished. We, no way, could close down that Chicago Post Office.

If you want to get to that, I could tell you what would happen to the commerce of this city if that should happen. So whether the source was electric or gas, as long as there was some comparability from a price standpoint, it didn't make a hoot of difference to me.

As late as December 10, after Peoples Gas had made its points about the faulty economic analysis known to USPS and, having exhausted its efforts at the local level, tried to obtain review in Washington, Assistant Postmaster General Craig similarly responded (Pl.Ex. 30):

By the same token, the Postal Service lives in a real world in which time constraints, local governmental actions, possible environmental considerations and other factors must be taken into account judgmentally, along with economics, in reaching important facility decisions. In this connection, we are unable to adopt as sanguine an opinion about the likely reg-

ulatory and environmental situation with a gas-fired plant as your letter suggests. While we wish it were otherwise, we have scars to prove the impact of these kinds of considerations on proposed postal facility actions.

While all this sequence has the earmarks of a "don't bother me with the facts, my mind is made up" viewpoint by USPS no matter how much the economics favored the gas alternative, that would not necessarily be fatal if the decision had been firmly grounded on legitimate considerations: the need for an EIS and the forced delay, making the project impossible of accomplishment. But the hearing disclosed an astonishing situation in that respect. It should be remembered that P&W itself, the expert to whom USPS had delegated the function of making the environmental assessment, had concluded (Pl.Ex. 7 at 99):

> *Gas Boiler Plant.* Would present negligible environmental and aesthetic impact. However, a variance would be required to reduce the height of the stack to minimize the possibility of an EIS. Also, an additional offset possibly may be required to meet State regulations.[13]

Gailmard testified that despite the expert opinion confirming "negligible environmental and aesthetic impact," he had concluded that he could not reach a decision to file a negative impact statement, which necessarily mandated his own triggering of an EIS (Tr. 109–10, emphasis added):

Q. My question is, as a project director you would have had no basis to file an environmental impact statement based on the record.

A. Yes, I would. I would have filed such a statement.

Q. Are you possibly confusing the assessment from the statement?

A. No.

Q. What would be the basis for you filing an impact statement?

A. Procedures within the Postal Service which are the responsibility of the person designated as the responsible official in the Postal Service. That is the person who is or is going to be the contracting officer for such a project. That person has to, and only that person, has to review an assessment and make a determination on whether or not he can sign a negative declaration. *Our policy, I will say within the Postal Service in such matters, is that where there is controversy, where there is an issue that can generate even potential controversy, that a negative declaration should not and will not be filed.* And, all I can add is that following my discussions with the City of Chicago I felt strongly that there would be no way that I could file such a negative declaration if a gas plant was selected.

Gailmard had already reached that conclusion May 14 (Tr. 126).

But Gailmard's decision in that respect was specifically based on a prior USPS regulation on Environmental Assessment and Impact Statement Procedures, Def.Ex. 2A, which read at page 9:

IV. *DETERMINING ACTIONS FOR WHICH AN EIS MUST BE PREPARED AND ACTIONS TO BE ASSESSED*

A. Types of Actions Covered. Environmental Impact Statements normally are not required for the principal types of projects and program activities undertaken by the Postal Service. An occasional individual postal facility project is environmentally controver-

---

**13.** During the hearing Walter J. Bissonnette of P&W, who had the responsibility for developing the environmental portion of the P&W Study, acknowledged that the "additional offset" reference was the result of a flat-out mistake on P&W's part (Tr. 303–06). Like Gailmard's more crucial mistake next discussed in the text, P&W's error was the product of not knowing about a change in the applicable rules or regulations (Tr. 308–09). It is most distress-

ing to find this and other critical errors by P&W in a professionally prepared expert document on the strength of which a multi-million dollar decision by governmental authorities was based. Unlike the other more significant errors discussed in the body of this opinion, however, no knowledge of the mistake about the offset requirement can be ascribed to USPS.

sial, however, and a small number of such projects have been determined to have environmental effects of sufficient significance to warrant the preparation of Environmental Impact Statements. Accordingly, a documented environmental assessment shall be made of each proposed project and program of a type listed below, and a determination shall be made as to whether each such proposed project or program is a major action significantly affecting the quality of the human environment to ascertain if an Environmental Impact Statement is required:

1. Acquisition of postal space, whether by direct construction or lease construction, or by purchase, lease or condemnation of existing buildings or improvements.

2. Modernization, improvement, or alteration of existing facilities where the external configuration is changed substantially, or the postal mission is changed significantly.

3. Use of Postal Service property by others, through permit, lease, license, or other arrangement, resulting in a significant change in usage of the property; major disposals of real property.

4. Any proposed action which is, or is likely to be environmentally controversial.

However, that regulation had been *superseded* in November 1979 (!), a fact that Gailmard candidly acknowledged he did not know until he learned it during cross-examination at the hearing before this Court. When Gailmard actually reached his decision and the Draft Analysis was written in May 1980, and when the Analysis itself was written in July 1980, the entire thrust of the Regulation had been changed in that respect. Under the new Regulation, the existence of "extraordinary circumstances or controversy which may cause it to have a significant environmental effect" would no longer justify preparation of an EIS. Instead, the possibility of controversy played

a role only in determining whether an environmental *assessment* (not an EIS) had to be prepared for projects that were otherwise categorically excluded from *either* an environmental assessment or an EIS (Def.Ex. 2B, ¶ 4.2 at 11). With respect to projects such as that involved in this case, where that environmental assessment *had* been prepared by P&W, and where the assessment showed *no* significant impact from a gas-fired installation, it was Gailmard's *duty* to prepare and issue the finding of no significant impact that he had wrongfully refused to issue (*id.*, ¶ 4.15.1 and 4.15.2 at 20): [14]

4.15 *FINDING OF NO SIGNIFICANT IMPACT*

4.15.1 If the site planning report environmental assessment indicates that there is no significant impact of a proposed project/action on the environment, an environmental impact statement is not required and the responsible postal official (Director, Office of Program Planning, for major facility projects) prepares and issues a finding of no significant impact in accordance with Chapter 6.

4.15.2 A finding of no significant impact briefly presents the reasons why the project/action will not have a significant effect on the human environment and states that an environmental impact statement will not be prepared. It must refer to the environmental assessment and any other environmentally pertinent documents related to it. It must follow the format contained in Appendix VII.

■ It is therefore crystal clear that when P&W, the experts upon whom USPS was placing total reliance for that purpose, had *completed* their environmental assessment with its conclusion of negligible environmental impact of a gas-fired installation, it was USPS' duty *under its own regulations* to *issue* the negative impact state-

---

**14.** These provisions have since been carried forward as Paragraphs 250 and 251 of the currently effective USPS Environmental Procedures Handbook RE–6, Pl.Ex. 2C.

ment as to gas, *not* to issue an EIS [15] and to consider the economic superiority of the gas-fired installation in *that* context. That crucial failure forces reversal of the ultimate USPS decision, grounded as it was on the predicate of a wholly improper action. See *Citizens To Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–16, 420–21, 91 S.Ct. 814, 823, 825–26, 28 L.Ed.2d 136 (1971).

Once Gailmard learned, during his testimony at the hearing, of his fatal mistake as to the applicable regulation, he candidly acknowledged that he could not refuse to make a negative impact statement in reliance on controversy or its possibility (Tr. 375–76). Nonetheless, he indicated (Tr. 377, 386) that he might have reached the same conclusion had he known the true situation. But that effort to invoke the equivalent of a "harmless error" doctrine must fail. Even apart from the spur-of-the-moment rationalization context in which Gailmard expressed that point of view, rather than the studied and thoughtful decision having major economic significance that is surely required here, the ultimate decision is after all that of the Board of Governors. There is no way to know what their decision would have been had the Board of Governors been presented with a fair rather than a flawed analysis of the alternatives. In this respect two factors should be remembered:

(1) Under USPS regulations, the most cost effective alternative (the gas boilers) is to be chosen unless the other alternative is "fully justified." We cannot *presume* that the Board of Governors would have viewed the selection of electricity as "fully justi-

fied" if the presentation had been that gas was economically superior and that USPS would *not* require an EIS for *either* gas or electricity.

(2) At this stage of the proceedings, the test is not whether Peoples Gas must ultimately prevail but whether there is a reasonable likelihood of its doing so. As pointed out earlier, however, if the parties seek a definitive decision on the present record the Court is prepared to rest its determination on the need for the Board of Governors to make a fully informed decision as it has not heretofore done.

Because USPS must reevaluate its decision in any case, it is appropriate to discuss several matters relating to the economics that should be taken into account in that reevaluation. In that respect of course the Court will *not* impose on USPS the burden of reshaping its factual analysis of matters that involve judgmental consideration, for the decision to be made is that of the agency not the Court. Indeed, the items identified in the following discussion as to be taken into account are matters that were either known to USPS or properly chargeable to its knowledge:

(1) In calculating fuel costs it is uncontroverted that USPS is bound by its own standards to use Department of Energy ("DOE") figures for the projected rates of future escalation. Gailmard testified (Tr. 67) that DOE escalation rates are controlling on USPS and that P&W was so directed.[16] USPS will not now be heard to assert the truism that the future is highly uncertain, for it has a legal obligation to make the best available estimate with the criteria

---

15. As for the possibility of third-party action to require an EIS if Gailmard had made the negative impact finding he was obligated to but did not make, Gailmard testified (Dep. 244): "I don't think we have ever been forced into doing an impact statement by court action; not that I can recall." It should also be remembered that the prospect of such third-party action if a 200 foot stack obtruded into the low-profile Chicago skyline at that location must be very different from the possibility of such action being triggered by a stack exposed only 12 feet above

an existing structure, as would be the most likely effect of a variance. Thus the error regarding stack height, discussed later in this opinion, infected the EIS situation as well.

16. Despite that direction, P&W incorporated verbatim into its Study (Pl.Ex. 7 at 56–57) material provided by Commonwealth Edison (Pl.Ex. 22) expressing a rationale for various other projected escalation rates more favorable to electricity than to gas. Those projections were in turn made the basis for P&W Tables 8 and 9 (Pl.Ex. 7 at 78–81).

mandated for that purpose.[17] Nor will it be heard to say that it is not certain whether DOE's commercial or industrial rates are applicable (Bryan Tr. 364 and Dep. at 86–88).[18] Such arguments smack of after-the-fact rationalizations of a decision already reached. To permit government to ignore its own requirements would mean that the public would have no way to determine whether the government was turning square corners, as it must. It is one thing to say that we will not substitute our judgment for that of the administrators. It is quite another to permit the administrators to ignore the criteria they themselves are duty-bound to employ.

(2) P&W arrived at its September 1982 starting rate for the cost of gas by using substantially too high a current rate. It reached a 50 cent per therm rate for 1982 by compounding from an erroneous 36 cent base as of June 1980. In fact the properly applicable rate was between 31.34 cents [19] and 33.5 cents, depending on how the purchased gas adjustment was to be calculated (9.06 cents, which was the current rate as of June 1980, or 11.2 cents, which was the average of that variable factor for the pre-

ceding year [Smith, Tr. 267]). This portion of the record discloses a distressing performance by a skilled architectural-engineering firm hired for its expertise. P&W had only one brief meeting with a Peoples Gas representative, during which it was provided with the actual published rate schedules and the purchased gas adjustment information (Tr. 233–34). But instead of making its calculations from the published data, P&W (whose Project Engineer was experienced in that area and has made such calculations in the past, Tr. 236) used without verification the estimate the same Peoples Gas representative apparently gave orally during the meeting ("approximately 36 cents") as though that were a firm figure (Tr. 260). Nor can USPS claim ignorance on this score. Its program manager Dennis Bryan, who was meeting almost daily with P&W during preparation of the Study, is an engineer with broad experience who is also thoroughly familiar with fuel rates and their calculation and has had substantial experience and responsibility for the design, construction and planning of high pressure steam plants. Given the fact

17. P&W did just that in its Table 10 (Pl.Ex. 7 at 82–83), using the controlling DOE escalation rates and concluding that gas was economically superior. That recommendation was carried forward as the predicate for USPS' decision, for USPS had specifically also delegated the economic determination to P&W. In light of those facts, Assistant Postmaster General Craig must be viewed as irresponsible in responding to Peoples Gas in his December 10 letter (Pl.Ex. 30):

Without getting into all of the details covered in your letter of December 5, our decision hinged predominately [sic] on the fact that the economics of this project are highly sensitive to estimates of future energy prices. No one can predict with accuracy what will happen in the highly volitile [sic] situation we currently face with regard to energy prices. Depending on what happens, however, the use of gas could prove advantageous or the use of electricity could prove advantageous, or the use of each fuel could turn out to be fairly similar in its economic implications.

And the same may be said of USPS Program Manager Bryan, whom USPS relied on during preparation of the P&W Study and at the hearing as its expert on engineering matters (and specifically heating). After Bryan confirmed his expert view that P&W was responsible and

accurate (Tr. 338–39), he effectively sought to undercut the P&W determination of comparative economics by stating, "I firmly believe that over a 20-year period the economics are a toss-up" (Tr. 355).

18. P&W specifically used DOE's projections for escalation of *commercial* rates in Table 10 of the Study. That categorization of course comports with the common sense view of USPS operations (which could scarcely be characterized as "industrial"). And again USPS cannot have it both ways. Having retained P&W for its expertise and having delegated technical determinations to P&W, USPS cannot be heard retrospectively to substitute its offhand judgments for those of P&W, any more than this Court will substitute its own judgment for that of either P&W or USPS.

19. That figure was testified to at the hearing by Peoples Gas Manager of Rates and Economic Planning Teepe (Pl. Ex. 13, Tr. 147–51). P&W Project Engineer Smith (who had prepared that part of the P&W Study) stated (Tr. 263), after hearing the Teepe testimony, that he had no reason to doubt the validity of Teepe's figure based on the schedules and "would accept it within tolerance."

that the most important factor in the economics of this project is the cost of fuel (about $1 million per year for gas and about $2 million per year for electricity at the June 1980 rates), and the further fact that any error in the base figure is magnified tremendously by the projected escalation of fuel rates, such slipshod work was frankly inexcusable.[20]

(3) In its analysis of current maintenance costs, P&W (at the direction of USPS) omitted the requirement under the Chicago Municipal Code that electric as well as gas high pressure boilers require stationary engineers to be on duty at all times—a difference in the comparative economics of some $200,000 per year. That was done on the basis that the federal government is not *bound* to comply with local requirements (presumably under the Supremacy Clause), though it customarily does so as a matter of preserving relationships with local government, and particularly where considerations of public health and safety are involved. In fact it appears that a loss of water in an electric boiler system, unlike a gas-fired system, would cause a shut down (described by Bryan of USPS as a "fail-safe" reaction) rather than a potential explosion. Peoples Gas' complaint of disparate treatment in this respect cannot override such a legitimate engineering judgment, which USPS was unquestionably entitled to make.

(4) By way of contrast, P&W included in the construction cost of a gas-fired plant the sum of $666,000 for a 200-foot stack, based on the literal requirement of the Chicago ordinance. It did so even though it

was advised that variances of the stack requirement were routinely granted.[21] In fact, minimal further checking would have disclosed (as Peoples Gas confirmed by communication with the City once it was given access to the P&W Study) not only that the variance was a non-problem but also that the stack would probably have to protrude only 12 feet over the existing structure on the site (Peoples Gas November 3 letter and the City's November 19 reply, sent to defendant Doran November 24, Pl.Ex. 30). All this is particularly troublesome because of the interrelationship between the erroneously-assumed need for a high stack and the prospect of having to travel the EIS route, as stated at pages 94–96 of the P&W Study:

> Because of the rapidly developing residential and commercial areas in the vicinity of the proposed boiler plant, developers or residents may consider a high stack aesthetically unpleasing or falsely associate it with a source of high pollution. In turn, this may require an Environmental Impact Statement to be written.

Such treatment is inconsistent both with the known facts as to the City's position [22] *and* with the just-discussed view as to the independence of USPS (and the federal government generally) from forced compliance with City requirements in any case. It lends an appearance of bias to the P&W Study and the Analysis' approval thereof, an appearance that should be dispelled.

(5) P&W used a 70% efficiency assumption for gas boilers in its initial calculations, although at the later October 22, 1980 meeting with Peoples Gas it acknowledged that

**20.** Smith of P&W confirmed at the hearing (Tr. 269) that in response to Peoples Gas' initial protest received in October, P&W had recalculated the starting figure for gas fuel costs and had come out "very close to their [Peoples Gas'] number." No explanation was offered as to why that calculation, based as it was on published rates, was not initially made in the P&W Study.

**21.** In another example of troublesome inconsistency and errors in the P&W Study (Pl.Ex. 7), page 67 stated:

> This location would most likely require the installation of a 225 foot high stack whose cost is included above. It is unlikely that a

significant variance from this requirement will be granted by the City of Chicago. But at page 96 the story is changed to indicate that a variance "may be requested," stating only what the time requirements for obtaining one would be. Neither statement reflected the understanding of P&W's project manager Bissonnette, based on his meetings with the City authorities, that both they and he were "confident" a variance *would* be obtained (Tr. 291).

**22.** USPS was equally knowledgeable as to the extreme improbability of a high stack requirement. Gailmard testified (Tr. 95) that he was then "aware . . . the City granted variances on that height requirement as a matter of course."

76% would be a more appropriate figure (Smith Dep. 222). If the economics of the gas and electric alternatives did not have to be reviewed for the major errors already identified, the boiler efficiency item would not be a basis for independent reexamination. Under the circumstances, however, P&W should use the correct numbers in its calculations.

(6) Much the same may be said of the elimination by the USPS Capital Investment Committee of the proposed Energy Conservation Modifications included in the P&W Study and the Analysis. Because of that elimination, anticipated fuel needs would be higher, so that the fuel with lower initial cost (gas) would have a greater economic advantage. Recalculation should be made in that respect so that USPS' Board of Governors will be armed with *all* of the facts in accurate form when it makes its determination.

(7) Peoples Gas offers a construction cost analysis that purports to show further substantial errors in the comparison between the two systems, under which a gas plant would actually be cheaper rather than more expensive to build than the electrical installation. If true, that would of course increase immeasurably the economic advantage that the P&W Study reflects (an advantage to be increased in any case by factors 2, 4, 5 and 6 already reviewed). However, those matters appear to be judgments as to which the honestly-held views of P&W, the USPS independent experts, must prevail.

(8) Peoples Gas also complains of the use of a 20-year period for the economic comparison, rather than the 10-year maximum period normally employed by USPS. USPS adopted 20 years because it viewed the expected useful life of the heating plant as 40 years, and the 20-year half life therefore seemed appropriate. Again that is a value judgment that neither Peoples Gas nor this Court can properly override.

### Conclusion

Peoples Gas is entitled to the preliminary injunctive relief it has sought in this action.

Prompt reevaluation of the project's comparative economics should be made consistent with this opinion, coupled with a negative impact statement as to both gas and electricity, and transmitted through the appropriate administrative procedures for the final decision by the USPS Board of Governors. Each party is directed to submit to this Court and to the other party (1) its proposed form of order and (2) information it deems relevant to fixing of the amount of security to be given by Peoples Gas in accordance with Rule 65(d), the time for such submissions to be designated by minute order at the time of delivery of this opinion to the parties.

Ultimate determination of the merits of this action will await further submission by the parties in accordance with this opinion.